## JOHN W. E. SUDLER and ARTHUR E. SUDLER, Next Friends of LAURA L. BEATTY, Infant,
### *vs.*
## FOSTER SUDLER.

*Infants : guardians of—. Jurisdiction of Orphans' Court; domicile of infant; change of—. Natural guardian. Guardian's bond. Administrator of decedent : not guardian for the infant children.*

An appeal will not lie from an order of the Orphans' Court appointing a guardian, when the Court had jurisdiction to make such appointment.                                   p. 48

The provisions of the Code (section 144, Article 93), conferring jurisdiction for the appointment of guardians of minor children on the' Orphans' Courts where the infants reside, refers to the domicile and not to the mere place of the infants' residence.                                   pp. 48, 49.

A minor can not by his own intention or act fix or change the place of his legal domicile.                                   p. 50

The domicile of a minor for purposes of guardianship is that of the parents or of those standing *in loco parentis,* even though at the time of such appointment such infant may be residing in another county or State.                                   p. 50

Where the mother of a minor, whose father is dead, has made her domicile in a certain county, the Orphans' Court, of such county, upon her death, has jurisdiction to appoint a guardian for the infant.                        ·         p. 52

The father of a legitimate child, and, upon his death, the mother, is the natural guardian of the children.          pp. 50, 52

*Semble*: the next of kin will not succeed to such office as of right.                                   p. 53

But before the mother may act as guardian she must qualify and give bond.          ·                    .          p. 54

Under the Code, a guardian, before proceeding to act as such, must file bond in such security as the Court shall approve.
p. 53

On the death of the minor's father and mother, one of her uncles removed her from the county to Baltimore City, where she and he intended her permanent home to be made; the uncle appealed from the order of the Orphans' Court of the county, where the parents had died and which had been their residence, appointing a guardian for the infant. *Held,* that, without regard to other questions, since the uncle had not qualified as guardian by giving bond, he could not act as guardian for the purpose of changing the domicile of the infant, and the order of the Orphans' Court appointing the guardian was affirmed.                                    p. 53

Section 151 of Article 93, providing that when no guardian is appointed the administrator of the testator's estate should take charge of the estate and discharge the duties of the guardian to the infant, only contemplates the temporary care of the infant's property.                            pp. 55-56

The appointment of the administrator of a decedent's estate as guardian for his infant children is not favored.        p. 56

*Decided May 10th, 1913.*

Appeal from the Orphans' Court of Queen Anne's County.

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Isaac Lobe Straus* (with whom were *H. B. W. Mitchell, James T. Bright, J. Frank Harper,* and *Walter D. Eiseman,* on the brief), for the appellant.

*L. Wethered Barroll* (with whom was *Madison Brown,* on the brief), for the appellee.

Boyd, C. J., delivered the opinion of the Court.

The question in this case is whether the Orphans' Court of Queen Anne's County had jurisdiction to appoint a guardian of Laura L. Beatty. It was decided as early as *Compton* v. *Compton,* 2 Gill, 241, that no appeal will lie from an order of the Orphans' Court appointing a guardian when it has jurisdiction to make the appointment, and JUDGE MAGRUDER said: "The Orphans' Court, in the discharge of this duty, may make an injudicious choice; but it is not probable that this Court, without any information to assist them, could exercise such a power more judiciously." Whether or not the Court had jurisdiction to appoint a guardian was dependent upon where the infant resided. Section 144 of Article 93 of the Code of 1912 provides that whenever a male under the age of 21 years or a female under the age of 18 years acquires or is entitled to property as therein described, "and the said male or female shall not have a guardian appointed by last will and testament, agreeably to law, *the Orphans' Court of the county in which such infant shall reside* shall have power to appoint a guardian to such infant until the age of twenty-one years, if a male, and until the age of eighteen, if a female, or married," etc.

On December 10th 1912, the appellee made application to the Orphans' Court of Queen Anne's County to be appointed guardian of Laura L. Beatty. Arthur E. Sudler, one of the appellants, objected to the appointment and asked for further time. The Court fixed December 18th, 1912, as the time for the determination of the matter, at which time the appellants filed their petition and protest against the appointment of the appellee on the ground that the Court had no jurisdiction to make it. They asked leave to offer testimony in support of the allegations of their petition and protest, but the Court refused to grant it and passed orders dismissing the petition and appointing the appellee such guardian. Appeals were taken from those orders.

The petition shows that Laura L. Beatty, who was fourteen years and six months of age, is the only child of Louis

M. Beatty and Mary M. Beatty, his wife; that Louis L. and
Mary M. Beatty resided during their joint lives in Queen
Anne's county; that at or about the time of his death, which
occurred about six years before, Mary M. Beatty removed to
and took up her residence and abode in Baltimore City,
where she resided until the month of May, 1912, when she
removed with her daughter to her farm in Queen Anne's
county, where they resided until October 23rd, 1912, when
Mrs. Beatty died intestate; that Mary M. Beatty was a widow
at the time of her death and there is no father or mother of
either Louis L. Beatty or Mary M. Beatty surviving. The
petition then alleges: "3. That on the 26th day of October,
1912, after the death of said Mary M. Beatty, the said Laura
L. Beatty of her own volition and with the consent of her
uncle, said Mary M. Beatty's brother, who resides in Balti-
more City, Maryland, took up her residence, habitation and
abode with her said uncle, said Arthur E. Sudler, and with
the desire and intention of making said Baltimore City her
permanent residence and domicile. The said Laura L. Beatty
now lives and resides with her said uncle, Arthur E. Sudler,
in Baltimore City, and the said Laura L. Beatty is going to
school in Baltimore City, and it is her expectation and in-
tention to continue to make Baltimore City her home and
residence. 4. The said John W. E. Sudler and Arthur E.
Sudler are the only surviving brothers of said Mary M.
Beatty, administrators of her estate and are the maternal
uncles as aforesaid and next of kin to said Laura L. Beatty."
The petition then sets out the reasons why the appellee should
not be appointed guardian.

In determining the meaning of the expression in the stat-
ute that "the Orphans' Court of the county in which such
infant shall reside" it would not do to simply ascertain where
the abode of an infant is, but as said in 21 *Cyc.* 24, "Al-
though the terms 'residence' and 'domicile' are not in all re-
spects convertible terms, the word 'residence' as used in the
statutes relating to the appointment of guardians for minors

is, according to the weight of authority, to be construed as synonomous with ' domicile.' " It is said in 21 *Cyc.* 25 that "The ward cannot himself change his domicile by removal because he is not *sui juris;* nor does the removal of the ward to another State or county by relatives or friends in any way affect his domicile." See also 15 *Am. & Eng. Ency. of Law* 35; *Woerner's Am. Law of Guardianship,* p. 80, sec. 26. That being so the fact that it is the expectation and intention of this young lady to make Baltimore City her home cannot alter the situation during her minority.

Again, in 14 *Cyc.* 843, it is said: "An infant being *non sui juris* is incapable of fixing his domicile, which therefore during his minority follows that of the father, provided such child is legitimate;" and on page 844, "If the father dies during the infant's minority the power to fix the domicile devolves upon the mother who may alter it at pleasure, provided it be without fraudulent motive respecting the succession to the estate of the infant." In 21 *Cyc.* 25, it is said: "The domicile of the minor for purposes of guardianship is that of its parents, or of those standing *in loco parentis,* even though at the time of appointment such minor may be residing in another county or in another State." In 15 *Am. & Eng. Ency. of Law* 33, the rule is thus announced: "The domicile of an infant, for the purpose of conferring jurisdiction to appoint a general guardian, primarily arises from the domicile of the father, or, if the father be dead, from his domicile at the time of death. But if, since the father's death, the mother, without fraudulent intent, has removed her residence and that of the child to another jurisdiction, the infant's domicile will be deemed to follow that of the mother." And on page 35: "Where, however, the parents are dead, or have relinquished the custody of their infant, and it is living with other relatives acting *in loco parentis,* their residence will be deemed sufficient to confer jurisdiction to appoint a guardian."

The case of *Allgood* v. *Williams,* 92 Ala. 551, is a leading case and is often referred to. The language of the statute in

force in that State at the time that decision was made was "Guardians must be appointed for minors under the age of twenty-one years by the probate Court of the county in which such minor resides." The Court said: "Though the word *'residence'* is often used to signify a temporary abode, it is also used to signify a fixed and permanent home. Residence and domicile are not in all respects convertible terms; but when 'residence' or 'resides' is employed in a statute, relating to succession, grant of administration, and of guardianship, it is generally construed to mean the legal residence and as equivalent to domicile. *Jac. Dom.,* sec. 75." In that case the father whose domicile was in Blount county took his child to his brother in Morgan county in the fall of 1887, which was shortly before his death. The Court said: "The expression of the father of the minor to his brother, to take his child and raise her right, made three or four weeks before his death, did not constitute the residence of the brother the domicile of the minor. Therefore the domicile of the father, at the time of his death, determines the jurisdiction of the Court to appoint a guardian." The Supreme Court of Alabama having determined that Blount county was still the domicile of the father reversed the order of the Probate Court of that county which had revoked the letters of guardianship previously granted by it on the ground that the ward's residence was not in Blount county. The mother of the child died before her father, and hence there was no question as to the mother's domicile.

In *Woerner's Am. Law of Guardianship,* section 26 page 80, it is said: "The residence of infants conferring the jurisdiction in the sense of these statutes means domicile or home, as distinguished from residence, which may be temporary or for a special purpose. The domicile of an infant is that of his father, if legitimate, or of his mother, if illegitimate, or after the father's death, or of a grandparent or other person standing in *loco parentis.* The placing of a child by the father in the custody of a person residing in another county does not affect the child's domicile, nor the mother's

right to its custody and care after the father's death; so that after her death the jurisdiction to appoint a guardian is in the county in which she was domiciled at the time, although she had been adjudged insane before the father's death and never declared restored. This domicile remains until the infant legally acquires another; and since the law conclusively disables infants from acting for themselves during minority, their domicile cannot be altered by their own acts before reaching majority * * * The authorities are substantially unanimous in according to the mother while remaining a widow, the power to alter the domicile of her infant children by changing her own,"—the latter statement of course referring to cases where there is no fraudulent motive in making the change.

In this case we understand it to be conceded—at least not denied—that the mother did change her domicile, if she had one in Baltimore, and returned to Queen Anne's county where she and her husband had formerly resided, and where she had a farm on which she resided at the time of her death. When then the mother died the child's domicile was in that county. As we have seen the child could not change her domicile, because she was not *sui juris,* and it only remains to determine whether one or both of the appellants could. It is contended that they as the next of kin of the minor are guardians by nature and that a natural guardian can change a ward's domicil. There is some conflict between the authorities as to whether any one but the father or mother can properly be said to be a natural guardian. In *Reeve's Dom. Rel.* 453, the rule is thus stated: "Guardianship by Nature. This by the common law extends only to the person; and the subject of it is only the heir apparent and not the other children * * * The father is guardian by nature, and in case of his decease, the mother, and on her death, the next of kin. Among next of kin priority of possession decides the right." But in *Schouler on Dom. Relations,* sec. 298, it is said: "Guardians by nature and nurture act under the authority of the law, which designates, first, the father, and after his

death, the mother. These are the only natural guardians possible. It has been said that the infant's next of kin succeed to the natural guardianship when both parents are dead. This cannot be correct according to the sense of the term as used at this day." In *Hochheimer on Custody of Infants,* section 6, it is said: "The father, upon his death the mother, is guardian by nature of all the infant children. They are the only natural guardians. The next of kin do not succeed them." But without deeming it necessary to determine whether an uncle may after the death of both parents be a natural guardian, the provisions of our Code would seem to show that Arthur E. Sudler could not as natural guardian have changed the domicile of this young lady at the time it was contended it was changed. Section 186 of Article 93, Code of 1912, provides that "Every natural guardian or guardian appointed by last will and testament of the estate and property of minors shall settle an account of his guardianship, and shall be under the like rules and regulations hereinbefore prescribed for other guardians;" and section 155 of that article provides: "Every guardian appointed by the Court, and every guardian by a will, or natural guardian, *before he proceeds to act as such,* shall enter into bond to the State of Maryland in such penalty and with sure sureties as the Court shall approve, and to be recorded and be subject to be put in suit, and be in all respects on a footing with an administrator's bond, with the following conditions."

Whatever rights an uncle may ordinarily have to assume the duties of a natural guardian, as Mr. Sudler had not given his bond required by the last mentioned section, "before he proceeds to act as such," it cannot be said that he had the power to change the domicile of this young lady. The authorities are not uniform as to the power of a statutory guardian to change the domicile of his ward, but there would seem to be no doubt that a removal of an infant from its former domicile by a person unauthorized or by the infant's own act, without the consent of a parent or guardian, would not effect such a change. 15 *Am. & Eng. Ency. of Law* 34. And al-

though it seems to be quite well settled, that a natural guardian may in good faith change his ward's domicile, either from one State to another, or from one county to another in the same State on the principle that "this doctrine amounts to no more than that the domicile of the parent is the domicile of the child," 21 *Cyc.* 63, our statute requiring the bond to be given "before he proceeds to act as such," would certainly require that it be given before he could exercise such a power as changing the domicile of an infant which may very seriously and sometimes injuriously affect the rights of an infant. As we have seen above "the ward himself cannot change his domicile by removal because he is not *sui juris;* nor does the removal of the ward to another State or county by relatives or friends in any way affect his domicile." 21 *Cyc.* 25. Even in case of a mother our predecessors said in *LeFever* v. *LeFever,* 6 Md. 472, "It is true, that upon the death of the husband his widow becomes the natural guardian of her infant children, and is recognized both by our statutory law and judicial decisions as having, in general, the right to the control of both their persons and property, to the exclusion of all other persons. This is nevertheless a right which the widow may exercise or not in her discretion, but it is attended with the correlative obligation or duty to qualify and get bond, as prescribed by the Act of 1816, Chapter 203. The exercise of the right, therefore, depends upon the performance of the duty and unless the latter is discharged is a regular manner and in a reasonable time, it will work a forfeiture of the right or privilege. We can perceive no good reason nor discover any authority for the assumption, that the mother must make a *formal renunciation* to act as guardian for her children before another can be appointed in her stead." Such being the law even as to a mother, surely it cannot be said that an uncle who has not qualified by giving bond can change the domicile of a minor, even if it be conceded that he could become her natural guardian. It frequently happens that after the death of both parents, leaving an infant child, some kind relative will take

the child to his or her home, but it would leave the law in great confusion if the removal of infants to another State or county would take away the right of the Orphans' Court of a county where the surviving parent lived to appoint a guardian. In this case the minor was taken to Baltimore three days after the mother's death—before letters of administration had been granted on the estate of her mother, and while it was doubtless a kind and proper act on the part of the uncle, it might not be to her financial interest to change her domicile, as without mentioning other reasons, the probabilities are that the taxes on her personal estate would be heavier in Baltimore than in Queen Anne's county.

It was suggested for the appellants that under section 151 of Article 93, they were entitled "to discharge and fulfill all the duties of guardian" to the infant, but while that section does provide that where no guardian has been appointed the administrator of the deceased "shall take possession of such estate and discharge and fulfill all the duties of guardian to such infant, and shall account with the Court in like manner as guardians are required by law to account, and subject to the like control and authority of the Court, in all respects whatever," section 152 provides that no administrator shall be bound to discharge the duties of guardian "after the close of his administration, or after the end of three years from the granting of such administration, nor after a guardian shall be appointed by the Orphans' Court."

Those sections seem to us, in so far as they reflect at all upon the question, to be against the contention of the appellants. Undoubtedly under those sections, if no guardian was appointed the appellants would have been required to account as guardians in the county in which they were appointed administrators, which was Queen Anne's county. They certainly could not have accounted in Baltimore City for the acts done by them under their appointment as administrators by the Orphans' Court of that county. Those sections, however, only contemplate the care of the infant's prop-

erty temporarily by the administrators and do not intend that an administrator shall be the permanent guardian of infants interested in the estate. In many States there are statutes prohibiting the appointment of administrators as guardians, and in the absence of statute some Courts have advised against such appointment, on the ground that the infants should have independent persons to guard their interests. In this case there is nothing to suggest that the appellants would not do full justice to their niece, but there is a great deal of force in the position taken by some of the authorities that the Courts having jurisdiction to appoint guardians should not appoint as such the administrators of estates in which the infants are interested. We have no such prohibition in this State, but as administrators settle with the guardians of infants, the fact that the appellants are administrators of the minor's mother's estate would not furnish any reason for appointing either of them her guardian.

Controversies over such appointments are not generally for the best interest of infants, and it is to be hoped that this minor will not suffer from the conclusion which our understanding of the law must lead us to. The guardian who has been appointed is not required to take her from her uncle's home or to deprive her of such educational facilities as living in the City of Baltimore may afford her and we cannot assume that he will not act for the best interests of his ward. Being of the opinion that the Orphans' Court of Queen Anne's county had the power to appoint the appellee the orders passed on December 18th, 1912, will be affirmed.

*Orders affirmed, the appellants to pay the costs.*