A, PLAINTIFF, v. M AND C, DEFENDANTS.

Middlesex County Court
Probate Division

Decided March 30, 1962.

106

*Mr. Joseph Feinberg* for plaintiff (*Messrs. Feinberg & Feinberg,* attorneys).

*Mr. William F. Little, Jr.,* for defendants (*Messrs. Armstrong & Little,* attorneys).

SCHWARTZ, J. C. C. This is an adoption proceeding. Plaintiff A is domiciled and resides in New Jersey. The infant S, born August 27, 1957, resided with her and her late husband from July 3, 1959 until October 8, 1961, when the husband died. S has been living with her since. The infant was born in Connecticut, and her parents M and C are domiciled there. Plaintiff maintains that the mother (M) gave custody of S to her and her husband on July 3, 1959 with the intention that she "raise her as your own," knowing "she'll be in good hands." To support this intent a letter from the mother dated July 23, 1959 was placed in evidence. It reads as follows:

"July 23, 1959

I, [M] * * * give the right to Mrs. [A] * * * to take my baby, [S] * * * out of the state as they please.

* * * * * * * *"

From

* * * * * * * *

The mother, however, says the letter and birth certificate were given at plaintiff's request so as to "give them permission to take * * * [S] any place they were going which would say in the letter that I gave my permission, I'd give my permission to take my baby to any place they please," and that by this letter, she had no intention to give permission and consent to adopt the child.

It is not disputed that the mother was about to have an operation performed and requested plaintiff and her late husband to take the child on recommendation of her welfare worker, as she had five other children and S, due to her age, was the greatest problem at the time.

The father was not living with the mother on July 3, 1959 and did not know the child was taken to New Jersey. The father left the mother in May 1958. They resumed life together, however, in October 1959. Plaintiff's deceased spouse was a first cousin of the child's father.

The parents filed an answer, appeared, and raised the question of jurisdiction at the close of the plaintiff's case. Maintaining that the child is not domiciled in this State, the parents argued there is no jurisdiction and advanced *In Re Susan*, 22 *N. J. Misc.* 181, 37 *A. 2d* 645 (*Orph. Ct.* 1944), as authority. The court reserved the question and the preliminary hearing proceeded, under *R. S.* 9:3–24, to completion.

Since "a conflict of laws problem arises whenever a foreign element gets into a legal question," *a fortiori* the question of jurisdiction here falls in that area of the law. *Goodrich, Conflict of Laws* (*Hornbook Ser, 3d ed.*), *pp.* 3, 166.

"The aspect of the subject of jurisdiction dealt with here is the power of a state, through its courts to create rights, which under the principles of the common law of Conflict of Laws will be recognized as valid in other states." *Ibid., supra, p.* 167.

In the *Restatement, Conflict of Laws,* § 42, *p.* 69, it is said "jurisdiction" (in this context) means the power of a

state to create interests which under the principles of the common law will be recognized as valid in other states.

Should New Jersey, under these facts, assume jurisdiction over creation of a status, having the effect of finality on nonresidents, resulting in severance of the natural relationship of parent and child and substitution of an artificial relationship, permitted by law, in its stead?

*In Re Susan, supra,* advanced by defendants as authority for their position, did not involve a conflicts of law question. A "foreign element" was not introduced or involved there. All parties involved were domiciled in New Jersey. Concern there was only with the county in which the proceeding was to be held. The statute at that time provided that the "husband and wife jointly, may petition the Orphan's Court of the county where the petitioner or any minor child may reside for permission to adopt * * *." (*R. S.* 9:3–1, repealed.) The action was brought in Bergen County. The adoptive parent resided in Union County, and the child lived with her. The mother's domicile was Bergen County and, in that instance, was the domicile of the child, as a matter of law. Residence was construed to mean domicile, and the child being domiciled in Bergen County, the Orphan's Court there ruled it had jurisdiction notwithstanding the child resided—that is, actually lived in Union County.

The broader concept of a state's jurisdiction to create an interest (the status of adoption) in the absence of domicile of one of the parties to the status, is the question here. The status involved here is denominated "domestic status." 2 *Beale, Conflict of Laws, pp.* 649–650. The action being in the nature of a proceeding *in rem,* does the State have jurisdiction over the *res,* that is, the said status? See *In Re Susan, supra,* at *p.* 182, on "extra-territorial effect."

The status of adoption is the settled relation between the adoptive parent and the adopted child, and is a creature

of statute unknown to the common law. *Adoption of Robinson,* 26 *N. J. Super.* 440 *(App. Div.* 1953).

Our present statute provides that the action *"shall* be instituted in the Superior Court; or it *may* be instituted in the Juvenile and Domestic Relations Court or County Court of the county in which the plaintiff is domiciled," with certain exceptions which are not relevant here. *N. J. S. A.* 9:3–20 (emphasis supplied)

The statute does not specifically exclude an adoptive parent not domiciled in New Jersey. Further, the statute neither specifically requires that the domicile of the child be in this State nor does it state that adoption may be granted notwithstanding the child is domiciled elsewhere. It is silent in those respects, excepting that it permits the action in the County Court or Juvenile and Domestic Relations Court of the county in which plaintiff is domiciled and it designates the Superior Court, without any requirement or mention of residence or domicile concerning any of the parties if the action is brought in the Superior Court.

Is the State of New Jersey without jurisdiction where the child is domiciled in Connecticut? That the child is domiciled in Connecticut must be conceded notwithstanding the letter of the mother, above noted. The domicile of the child follows the domicile of the father. It is settled that persons not *sui juris* are assigned a domicile by operation of law; a legitimate child takes the domicile of its father at birth; regardless of where the child may actually live, the domicile of the father is that of the child during minority. *In re Susan, supra,* 22 *N. J. Misc.,* at p. 185; *Restatement, Conflict of Laws, sec.* 14, *p.* 30, *sec.* 30, *p.* 55; *Stumberg, Conflicts of Law* (2*d ed.*), *p.* 45. *Yarborough v. Yarborough,* 290 *U. S.* 202, 54 *S. Ct.* 181, 78 *L. Ed.* 269, 90 *A. L. R.* 294 (1933); *Lamar v. Micou,* 112 *U. S.* 452, 5 *S. Ct.* 221, 28 *L. Ed.* 751 (1884); *Udny v. Udny, L. R.* 1 *H. L. Sup. Ct.* 441 (1869); *cf. Glass v. Glass,* 260 *Mass.* 562, 157 *N. E.* 621, 53 *A. L. R.* 1157

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*Sup. Jud. Ct.* 1927); also see *Sudler v. Sudler,* 121 *Md.* 46, 88 *A.* 26, 49 *L. R. A., N. S.,* 860 (*Cl. App.* 1913).

"Domicile is a subject of importance in our law because a considerable number of jural relations are determined by the law of the domicile of the person concerned. \* \* \* These are principally cases of personal status, such as marriage and divorce, legitimacy and adoption \* \* \*. \* \* \* Domicile is also an important basis of jurisdiction \* \* \*." 1 *Beale, op. cit., pp.* 91, 92.

Domicile has been referred to as follows:

"There is no doubt that every person has his domicile in that place where he has established his household and the chief part or bulk of his business and of his property; from which he is not intending to depart if nothing calls him away; from which when he goes away he seems to be wandering from home and when he has returned he has ceased to be wandering." *Ibid., p.* 96, citing *Lord v. Calvin,* 4 *Drew* 366, 375.

While adoptions have been successfully accomplished by compliance with laws of the domicile of the adopting parent where the child's domicile is elsewhere; *Rizo v. Burruel,* 23 *Ariz.* 137, 202 *P.* 234, 19 *A. L. R.* 823 (*Sup. Ct.* 1921); *Woodward's Appeal,* 81 *Conn.* 152, 70 *A.* 453 (*Sup. Ct. Err.* 1908); *Hopkins v. Gifford,* 309 *Ill.* 363, 141 *N. E.* 178 (*Sup. Ct.* 1923); *Stearns v. Allen,* 183 *Mass.* 404, 67 *N. E.* 349, 97 *Am. St. Rep.* 441 (*Sup. Jud. Ct.* 1903); *James v. Williams,* 169 *Tenn.* 41, 82 *S. W. 2d* 541 (*Sup. Ct.* 1935), and it has been held that adoption at the domicile of the child is valid where the adoptive -parents had no domicile within the state, *Rizo v. Burruel, supra; Goodrich, op. cit., p.* 448; *Wolf's Appeal,* 13 *A.* 760—10 *Sad.* 139 (*Pa. Sup. Ct.* 1888). See *Blanchard v. State ex rel. Wallace,* 30 *N. M.* 459, 238 *P.* 1004 (*Sup. Ct.* 1925), 24 *Mich. L. Rev.* 486 (1926), and such adoptions have been recognized as valid in a state other than the state of adoption, *Van Matre v. Sankey,* 148 *Ill.* 536, 36 *N. E.* 628, 23 *L. R. A.* 665, 39 *Am. St. Rep.* 196 (*Sup. Ct.* 1893); *Succession of Caldwell,* 114 *La.* 195, 38 *So.* 140, 108 *Am.*

*St. Rep.* 341 (*Sup. Ct.* 1905); *Fisher v. Browning,* 107 *Miss.* 729, 66 *So.* 132, *Ann. Cas.* 1917, *c.* 466 (*Sup. Ct.* 1917); *Restatement, Conflicts of Law,* §§ 142A, 143; the *Restatement,* § 142B, limits the former with the provision that the state of domicile of the adopting parent must have jurisdiction over the child or the person having legal custody of the child.

■ Plaintiff does not occupy the position of legal custodian since *N. J. S. A.* 9:2–14 provides, *inter alia,* that "no surrender of custody of a child shall be valid in this State unless made to an approved agency pursuant to the provision of this act or * * * substantially similar law of another State * * *." In addition, *N. J. S. A.* 9:2–15 provides that "No surrender of custody by nor termination of the parental rights of one parent shall affect the rights of the other parent; nor may one parent act as the agent or representative of the other parent in the surrender of custody or termination of parental rights."

While these sections are from *chapter* 2 of *Title* 9, dealing with care, custody, guardianship and support in general, *chapter.* 3, relating to adoption, applies the same definition of custody as *N. J. S. A.* 9:2–13(c). The word "custody" as used in the latter section has the following meaning:

"The word custody means continuing control and authority over the person of a child, established by natural parenthood, by order or judgment of a court of competent jurisdiction. or by written surrender to an approved agency pursuant to law."

Furthermore, the order entered in this matter fixing the date for this preliminary hearing under *N. J. S. A.* 9:3–23, *subd. A*(4), is required, among other things, to "declare that the child sought to be adopted shall be a ward of the court and that the custody of such child shall be subject to the further order of the court."

While Goodrich cites the cases above, in the former classification, as authority for a valid adoption where the adopt-

ing parents are domiciled, even though the child's domicile is elsewhere, and comments that the results "seem a desirable one." Beale takes a contrary view, that only the state of the child's domicile should have jurisdiction to permit adoption, and cites *Woodward's Appeal, supra,* and *Stearns v. Allen, supra* (cited by Goodrich in support of his view) as authority for adoption in a state other than the domicile of the child, where *the child has been abandoned or is a waif.* (Emphasis supplied)

Beale's analysis of those cases seems justified on a reading of the cases, and Beale distinguishes the other authorities cited by Goodrich as follows: *Hopkins v. Gifford, supra,* as a situation where a child was surrendered to an asylum in the state of adoption, which distinguishes it and *Rizo v. Burruel, supra,* as a decision which "cannot be supported" (since none of the parties was domiciled in the state) and the result would be difficult to justify; and in *James v. Williams, supra,* the question of the adopted child's domicile was not raised. The court merely held that the action in Tennessee was presumed to be in the county required by statute, *i. e.,* the county of petitioner's residence, since both the Chancellor and the Court of Appeals found this to be so. See *Goodrich, op. cit., p.* 448, 2 *Beale, op. cit., p.* 714.

The rationale of the cases advanced for support of the view that domicile of the child is not essential to the jurisdiction of a state does not on close analysis warrant such a view and has been bottomed on additional extremely relevant circumstances which in most, but not all, of the cases justified the result.

▇ That a state has jurisdiction where the adoptive parent is domiciled and the child is abandoned or is a waif is settled, and assumption of jurisdiction under such circumstances neither offends principles of common law that govern jurisdiction nor is contrary to or violative of any notion of extra-territorial effect of such proceeding. The child here has neither been abandoned nor is a waif, and

I so find. The circumstances of transfer of physical custody of the child, and the letter above referred to, are not in my judgment sufficient to conclude an abandonment; and the child is not a waif.

██ Since jurisdiction here means the power of a state to create an interest which under the principles of the common law will be recognized as valid in other states, *Restatement, Law of Conflicts,* § 42, *p.* 69; 1 *Beale, op. cit., p.* 274, and since under common law the state of domicile is allowed jurisdiction (*Beale, supra*), a state cannot by statute or otherwise increase its jurisdiction beyond bounds previously set by the common law, for such an attempt would not be recognized in other states. *Beale, p.* 275.

██ The parties to the status of adoption are adoptive parent and child, and it is the settled relation between them as parent and child of everything except common tie of blood. 2 *Beale, op. cit., p.* 713; *Markover v. Krauss,* 132 *Ind.* 294, 31 *N. E.* 1047, 17 *L. R. A.* 806 (*Sup. Ct.* 1892) ("Not * * * that the law attempted to do the work of nature, and create a child of one's blood out of a stranger, but that the law could and did make the legal *status* of the one in every respect that of the other.")

Is domicile of both parties in the State necessary to jurisdiction in this instance, where the child is neither a waif nor abandoned by parents? Learned authors on the subject are not of one mind on the matter, and the cases are irreconcilable and not sufficiently clear to say the subject is fixed beyond debate.

In 1905 Wharton said:

"In. other words, do statutes which determine personal status have extra-territorial force? Upon no question in international law do the jurists of the Continent of Europe, on the one side, come in more constant conflict with the Courts of England and of the United States, on the other side; upon no question in international law have, even among jurists schooled in the Roman .Law, greater variations of opinion been expressed." *Wharton, Conflict of Laws* (*3d ed.*), *pp.* 207, 208 (1905).

Although we are not here dealing with statutory construction, the above quotation is nevertheless an indication of the difficulty with the general question.

In those jurisdictions where statutory requirements include domicile of the child, absence of such domicile leads to failure of jurisdiction. This is clear enough, would be dispositive, and appears to embody the common law requirement of domicile for jurisdiction. *Herrin v. Graham,* 87 *Ga. App.* 291, 73 *S. E. 2d* 572 (*Ga. Ct. App.* Oct. 15, 1952).

However, in the absence of the requirement of such domicile, by statute, is the requirement essential or may a state take jurisdiction? If so, under what circumstances? While Goodrich says "the result is desirable" notwithstanding the child is not domiciled in the state, providing the adoptive parent is so domiciled, Beale tells us "jurisdiction to adopt would seem to depend strictly on common domicile of both parties since the status of both is affected." While Goodrich indicates the state of the adopting parent would have "sufficient interest" and supports it by saying "public policy favors adoption, the welfare of the child is generally best served by adoption," and "it may safely be assumed is under scrutiny of a competent court regarding the welfare of the child as a primary consideration," this reasoning, in my judgment, is not a sound enough foundation for his conclusion. See *Goodrich, op. cit.,* 3, p. 448, *note* 55. Beale says the child should be technically domiciled in the state, while Stumberg, another author, says that technical domicile, at least, should not be required. Beale's statement, that "the doctrine of all the cases" urged for the view of Goodrich is untenable since it involves the exercise of a power over the status of a child of which another state has power, and that the state of the child's domicile can safely and with due attention to the welfare of the child exercise such power, seems more fundamentally sound as the basic proposition or starting point. 2 *Beale, op. cit.,* p. 715; *Stumberg, op. cit.,* p. 338.

When Stumberg says that proceedings in a state where a child is only technically domiciled would not warrant recognition elsewhere (in a case of bare legal domicile and nothing else) I agree, but he further says that the state in which the child does not actually reside has not sufficient connection with the child and is not likely to have sufficient interest in its welfare. With this I cannot agree as a general proposition. He further says that "the state which is in the best position to protect the child against a disadvantageous adoption should be conceded the power * * *." *Ibid., p.* 336. Such statement is beyond cavil, but on what fixed general basis, as a rule of law, shall a court choose such state? What rule is fixed for clear and inherently just application, leaving exceptional cases for exceptional facts? I submit it must be domicile, unless the strict common law requirement of such domicile has been altered by the passing of time and changing needs, at least with respect to situations in which the state of forum has jurisdiction over the person having legal custody of the child.

To say technical domicile only, in another state, is insufficient to deprive a state of jurisdiction, would establish a criterion fraught with difficulty of application and potential injustice. When is a child only technically domiciled? If absent for one year or ten years? How shall it be determined that a child's connection with a state is no longer a pertinent factor? Absence for a shorter period might be more persuasive than a longer period. If technical domicile only is said to exist when parents on whom domicile depends are not available or are unknown, should not the facts giving rise to such conclusion be properly determined by the state of domicile? Furthermore, in such instance would it not be more desirable to rest jurisdiction on the ground of abandonment, which is conceded to be sufficient basis? To require a distinction to be made between technical and substantial domicile would, in my opinion, lead

to "idle logomachy" and tend to more confusion rather than less.

Beale tells us that

"Rules of law must be fashioned to take care of the ordinary, not of the exceptional case. It is true that the domicile has no more interest in the marital affairs of a person who is not in fact living there, and has only a nominal connection with it, than any other state, but it is especially important in cases of jurisdiction that there should be established a rule that is clearly defined and easy of application. The general rule is that the marital affairs of a person who lives in a community are of interest to the community as well as to himself. A place which is merely the temporary residence of a man has no particular knowledge of his marital experiences nor interest in their continuance. His own community, however, has such an interest and is to be protected in that interest by a general rule which will preserve through it the control over his marital status." 1 *Beale, op. cit., p.* 469.

While marital status was being discussed, the reasoning is equally applicable to the status of adoption and just as appropriate.

Another authority, 1 *Wharton, Conflicts of Law* (3d ed. 1905), *pp.* 564, 565, says, "but no state can declare that a person not its domiciled subject shall be the adopted child of another person."

The *Restatement, Conflict of Laws,* was authorized for publication in May of 1934. Beale's treatise was completed in 1935. The *Goodrich Conflict of Laws* (3d ed.) was published in 1949. Wharton is a much older work (1905). Stumberg's work was published in 1951.

With no precedent directly in point in New Jersey, which view shall this State adopt? Have considerations other than domicile become so germane with the changing of times and needs that the strict rule of domicile should no longer be the unexceptional determinative. The *Restatement* apparently recognizes this and has stated the rule to be as follows:

"The status of adoption is created by either:
a. The law of the state of domicile of the adopted child; or

b. The law of the state of domicile of the adoptive parent if it has jurisdiction over the person having legal custody of the child or if the child is a waif and subject to the jurisdiction of the state." *Restatement on Conflicts of Law*, § 142, *p.* 209.

Since the *Restatement* is (1) an orderly presentation of the general common law of the United States, including not only law developed by judicial decision but also growth of law from application of statutes that have been generally enacted and in force many years, and having as its objective acceptance by the legal profession as *prima facie* a correct statement of the general law, (2) and is presumably a true statement subject to contradiction in any state by authority to the contrary and subject to change by statute as well as development and changes with lapse of time and in the needs of people, and (3) is accepted by Beale in his treatise as representing the common law on the subject, with his treatise as a *commentary, Beale, op. cit., p.* 43. I consider the *Restatement* as the latest authority and, in the absence of contrary view in this State by statutory directive or decisional law, as the more extensive view on the subject, and I submit to it as the law upon which this decision should rest.

Since most states presently will recognize another state's jurisdiction, assumed on such a basis, the rule appears to square with the requirement of jurisdiction in this area of the law.

It is certain that common law changes—not merely the common law of a particular jurisdiction, but the common law system in general. This must be true, or the science of law, differing from all other sciences, would be unprogressive. 1 *Beale, supra, p.* 39. The genius of the common law does not lend itself to codification. "The common law itself is too flexible and too subject to change with the changing necessities of the people to be comfortably defined in dogmatic form." *Ibid., p.* 43.

The *Restatement,* it is said, was a palliative for purpose of restating the effect of the law as it was found to be at

the time of restatement because of the increasing mass of decisions, many irreconcilable; it is to be regarded as a statement by the highest court of a state would be regarded by the lawyers of that state, and is presumably a true statement of the law, subject to contradiction in any particular state by authority therein to the contrary; it is subject to change by statute and by development of changing needs with changing times. It is to promote certainty and clarity if adoption of rigid legislative codes is to be avoided as a solution. 1 *Beale, p.* 43; *Restatement, Introduction, p.* ix.

Thus, where the court has jurisdiction over the person of one having legal custody, the requirement of domicile as essential has been apparently altered as a matter of common law as set forth in the *Restatement*.

 The adoptive parent is domiciled in this State and the court has jurisdiction over the *person* having legal custody of the child.

The motion to dismiss is denied.

I now turn to the merits:

The hearing conducted by virtue of an order under *N. J. S. A.* 9:3–23, *subd. A*(4)(d) is designed for the purpose of determining the following, as set out in *N. J. S. A.* 9:3–24(A):

"(1) The circumstances under which the child was received into the home of the plaintiff;
(2) the status of the parents of the child with respect to further rights as to custody of the child;
(3) the potential fitness of the child for adoption; and
(4) the potential fitness of the plaintiff to adopt the child and to provide a home suitable for his [or her] rearing."

*N. J. S. A.* 9:3–25, relating to the appointment of a next friend provides:

"A. If upon completion of a preliminary hearing, the court is satisfied:

"(1) that the parents of the child should have no further right as to custody of the child;

(2) that the custodian or guardian, if any, should have no further control and authority over the person of the child;

(3) that the child is potentially fit for adoption; and

(4) that the plaintiff has the potential fitness to adopt the child and to provide a home suitable for the rearing of the child, it shall fix a day for final hearing not less than one year from the date of institution of the action and shall appoint, with due regard for the religious background of the child, an approved agency, having its principal office in New Jersey, as next friend; * * * [proviso —inapplicable]. Except for good cause, the approved agency appointed as next friend shall be the agency which made the investigation and report pursuant to Subsections A and B of Section seven."

Before determining the requirements of *N. J. S. A.* 9:3–24(A) and whether the court is "satisfied" in reaching the conclusions required by *N. J. S. A.* 9:3–25 a resumé of the salient facts disclosed by the agency report and the testimony is apropos.

The mother, M, and the father, C, are 28 and 34 years of age respectively and were married on April 16, 1951. Six children were born during the marriage, the first on November 9, 1951 and the last on December 29, 1959. S was born August 27, 1957. Plaintiff is 36 years of age.

In May 1958 C separated from his wife and did not resume cohabitation until October 1959. While he was absent the mother, in need of an operation and receiving aid from a welfare agency in Connecticut, where the parents and the family resided, requested that plaintiff and her husband take the child. Her welfare worker in Connecticut suggested this. The husband of plaintiff being a cousin of the child's father (and he and his wife godparents of the child), I assume that the emergency prompted the suggestion of the welfare worker, since the cousin and his wife were of suitable age and had no children of their own. S being less than two years of age at the time, plaintiff and her husband agreed and called for the child on July 3, 1959. The father paid a visit to the household in Connecticut, later in the month of July 1959 and learned the child had been transferred to New Jersey.

While plaintiff's testimony may have been exaggerated somewhat in view of her tragic situation and no offspring of her own, I place some credence in her description of the household in Connecticut. Conditions of squalor, and the child's uncleanliness and need for immediate attention by reason of skin rashes and bites, could not have been wholly imaginative and without factual foundation.

The agency report further discloses that the mother stated her husband had deserted her with a woman who had six children, and that the father, in August 1959 while plaintiff and her husband were visiting Connecticut with the child, suggested that plaintiff take another child home if she desired, and that he could not afford to raise his three legitimate children and certainly not the three who were not his offspring.

While the parents did see the child on several occasions in New Jersey and in Connecticut during the interval between July 3, 1959 and the commencement of this proceeding, the conduct of the parents, the mother in the first instance and the father by his failure to terminate the situation, permitted development of new ties which affect their strict legal rights as parents under normal circumstances.

A sordid element was introduced when it was said that plaintiff requested compensation for the period of her care for the child when the parents demanded the child's return and when it was said that the mother claimed the absence of the child was causing a reduction in welfare payments in Connecticut. Plaintiff justified this to the investigator by her statement (taken from the agency report) that she felt the parents would abandon their demand for the child if they had to pay her. The parents, on the other hand, nowhere explained away the allegation of their claim of loss of income due to the absence of the child. Plaintiff's explanation, under the circumstances, cannot be characterized as reprehensible.

While I do not give weighty consideration to either the fact of the father's spending time in jail or the report of extra-marital affairs of both parents while separated—indicated in the agency report and the testimony—it cannot be excluded from the entire picture notwithstanding that in and of themselves they might not be sufficient to justify removal of the child from their custody.

The episode Easter time 1961 (or Christmas, according to the agency report) when the parents and the mother and father of M arrived in C., New Jersey at 4:30 A. M. and demanded the return of the child, leaves much to be desired as support for the parents' position. This, however, was already at a time when the child had been separated from her roots in Connecticut for almost two years, which was one-half her life at the time.

The father, earning $25 per week at the time of the hearing, expected to return to full-time employment after the hearing. His income on full time would be $60–$70 net per week. His inability to work full time up to this point was the result of a serious automobile accident. The agency report indicates that the mother will supplement the income as a seamstress, since she is planning on taking sewing instructions.

No relatives of the parents appeared at the hearing, and the agency report throws little if any light on that factor in Connecticut. The record discloses that the mother's parents live somewhere in the vicinity in Connecticut and drove the parents to New Jersey in 1961, but the investigation did not include an interview with them.

Plaintiff, her parents and her sister described their living conditions at home in New Jersey and were impressive in their sincere desire for the welfare of the child. The agency report described the home where plaintiff and the child are residing with plaintiff's parents, as immaculate. Plaintiff as well as her parents are in comfortable circumstances financially. While the court took the opportunity to observe the child and speak to her in private, it was of little

value as to indicating the desire of the child, due to her age. My observation disclosed her to be an attractive little girl, very well dressed, and more interested in playing with a toy than in any discussion as to her preference or her recollection of her parents.

Plaintiff's father, 63 years of age, owns several parcels of real estate as well as his own home, and plaintiff has assets of around $13,000 and receives a monthly income of $40 on one of the policies on the life of her late husband which had a principal value of $5,072 at the time of his death. In addition, plaintiff earns $42.36 per week net, after deduction of $15.20 to her account with the credit union and $4 for bonds. Plaintiff also owns the home formerly occupied by her late husband and herself. Income from a tenant pays the mortgage on it.

Plaintiff attended school through the eleventh grade. The mother attended as far as the sixth grade, while the father has had practically no education. The agency report indicated that the mother, by reason of her advanced education, acted as head of the household.

The court has observed the demeanor of the witnesses. Plaintiff's testimony was undoubtedly geared to her emotions; the parents', in my opinion, not to so great an extent.

Emotion cannot be regarded as a factor under the law, otherwise natural ties would never be substituted by adoption. While the court, too, is subject to its emotions in such a sensitive matter, they must be discarded for the legal test. The child's welfare is the paramount consideration.

Will an adoption here promote the "best interests of the child?" The answer is a prediction. The court must dip into the future, with the past as the only available aid.

The severance of the natural ties is of such finality that great caution must and should be exercised. The enormity of an error is apparent. The natural rights of parents should be carefully guarded.

Since certainty of the future is not possible, the result must rest on a calculated appraisal of all pertinent facts and circumstances, to the exclusion of sentiment and emotion, once it becomes apparent that facts exist which could militate against the strict rights of parents and for which they are to be held accountable. While parents have undoubted rights to their children, a correlative duty obtains to prevent a situation arising which could alter the strict right or result in harm to the child.

The child was less than two years of age when placed in New Jersey. Her father left the household when the child was nine months old. The child cannot have much recollection of her father or her life in Connecticut. The last three of her five years have been spent living in New Jersey. Her memory of home in Connecticut cannot possibly be vivid, nor is it likely that she has any longing for her home in Connecticut. Her recollection, in all probability, cannot go back beyond the last three years.

The home in New Jersey, parental love and affection received there, and her opportunity for the future are clear. She has undoubtedly become bound to her ties in New Jersey, to the exclusion of anything else she ever knew.

"The court will not regard the parental right as controlling when to do so would imperil the personal safety, morals, health or happiness of the child. In determining this delicate and often difficult judgment, the court looks at the character, condition, habits and other surroundings of claimants." *Richards v. Collins*, 45 *N. J. Eq.* 283, 287 (*E. & A.* 1889).

While *Richards v. Collins* involved custody, the principles and tests applied there would satisfy the statutory guide for adoption and have been quoted in adoption proceedings. *Lavigne v. Family & Childrens Society*, 11 *N. J.* 473, 479 (1953), quoted *Richards v. Collins* as follows:

"* * * It is the instinct of childhood to cling to those who perform towards it the parental office, and they become endeared to it by ministering to its dependence." "A parent by transplanting

his offspring into another family, and surrendering all care of it for so long a time that its interest and affections all attach to the adopted home, may thereby seriously impair his right to have back its custody by judicial decree." * * * "The strict right of the parent will be passed by, if a judgment in observance thereof would substitute a worse for a better custodian."

That there is great difference in the homes; that the child is well cared for, loved and properly reared, and that the adoptive parent is fit and able to raise the child, is beyond dispute in my judgment.

That the father did not play a part in transferring the child to New Jersey is of little consequence. He learned of it in July 1959 and took no steps to recover custody until such lapse of time as to affect his rights. The child at such tender age was permitted to develop new ties and to endear herself to others on whom she depended. His initial right has consequently become subordinate to the best interest of the child.

A circumstance which gave me reason to pause on the merits was the death of plaintiff's husband, leaving her presently a widow. This unquestionably could be a factor of importance. It is safer to start with two guardians, such as a mother and father provided for by nature. It is undoubtedly greater protection for the future. Taking into consideration all of the surrounding circumstances, the parents of plaintiff, her five sisters and brothers all in New Jersey, and the closely knit family ties and interest in the child, the calculated risk that plaintiff in good health will live to raise the child to maturity is warranted. That she will embark on a romance which might play a part in affecting the child's welfare must be taken as a risk that is slight in comparison with the likelihood that the child's welfare will, in my judgment, always be the concern of plaintiff in any alteration of her marital status, as well as the concern of her entire family. The testimony and demeanor of the witnesses weighs persuasively in favor of this conclusion.

I have considered the fact that plaintiff is employed and away from home during the day. She works until 3:30 P. M. for five days a week. The child will be entered into school this fall (on the basis of her age), and consequently the mother's absence at work would not affect the relationship seriously. In addition, the mother of plaintiff, with whom the child spends her daily hours while plaintiff is at work, testified and was observed by the court. She appears physically capable of adequate attention to the child, and my observation of her and the child impressed me to the extent that the welfare of the child was uppermost.

The preliminary hearing having been completed, as required under N. J. S. A. 9:3–24, and its four objectives covered, I proceed to the matter encompassed by N. J. S. A. 9:3–25 as above noted.

From the testimony, the agency report and observation of the child I have reached the conclusion that the child was received into the home of plaintiff and her late husband at the request of the natural mother, and that the mother acted on the suggestion of her welfare worker in Connecticut because she was about to undergo an operation. Her husband was not living with her, and having six children, her infant S was the greatest problem. I have further reached the conclusion that plaintiff is potentially fit to adopt and to provide a suitable home for the child, and the child potentially fit for adoption.

I find that the parents of the child should have no further right to custody of the child.

While the court is now proceeding by virtue of N. J. S. A. 9:3–24 and 9:3–25, and the language "the best interests of the child" does not appear until it is used in the next two sections, nevertheless the findings, required by the first two sections mentioned, can hardly be separated from "the best interests" as the criterion, even though our concern here is only with right to custody. The final determination, however, under N. J. S. A. 9:3–27 requires that the judgment of adoption, where the court finds justifica-

tion to proceed to that point, can result only if the court "shall be satisfied that the best interests of the child would be promoted by the adoption" and for this purpose the statute requires (*N. J. S. A.* 9:3–26) that the next friend, prior to the final hearing, file with the court a report of its findings since the preliminary hearing, *including a recommendation as to the adoption.* In the event of such recommendation the court may dispense with the final hearing and enter judgment forthwith. (*N. J. S. A.* 9:3–27(a).) I mention this for the reason that the statutory design does not give to the findings on preliminary hearing the character of a final judgment of adoption. This must await the report of the agency and final hearing.

I trust that the report of the next friend, due to the circumstances here, will include the views of the appropriate child welfare agency in Connecticut in connection with the recommendation required by the statute. The ultimate question of the "best interests" of the child must therefore await final hearing.

I freely concede that I have wrestled with my own natural inclination in reaching this result. I have concluded that my own emotions must give way to a completely detached and dispassionate appraisal, based on the law and the facts. Using these as my guide, I am thoroughly convinced that the record, as disclosed by the agency report and the testimony, requires that the child remain undisturbed in her settled relation with plaintiff and her family. To now transplant her once more to the atmosphere and environment of the home in Connecticut would require a serious readjustment to a life and ties that she has forgotten.

I will entertain an application to settle the terms of an order to be entered in accordance with this opinion and fix a day for final hearing and appointment of a next friend under *N. J. S. A.* 9:3–25, *subd. A.*