Juan Carlos MORENO et al., Plaintiffs,

v.

UNIVERSITY OF MARYLAND and Dr. Wilson H. Elkins, President, University of Maryland, Defendants.

Civ. A. No. M–75–691.

United States District Court, D. Maryland.

July 13, 1976.

542

543

Alfred L. Scanlan and R. James Woolsey, Bethesda, Md., for plaintiffs.

David H. Feldman and Jack T. Roach, Asst. Attys. Gen., Baltimore, Md., for defendants.

JAMES R. MILLER, Jr., District Judge.

### Opinion and Order

This is a purported class action suit in which the named plaintiffs, Juan Carlos Moreno, Juan Pablo Otero, and Clare B. Hogg, seek declaratory and injunctive relief against the defendants, the University of Maryland and Dr. Wilson H. Elkins, its president. Both sides have filed motions for summary judgment. The named plaintiffs are currently students at the University of Maryland, College Park campus, who reside in the State of Maryland with their parents, upon whom they are financially dependent. Plaintiffs' fathers all hold non-immigrant alien visas issued pursuant to 8 U.S.C.A. § 1101(a)(15)(G)(iv) [1] [G–4 visas]. As employees of certain international organizations created under international agreements to which the United States is a party, the plaintiffs' fathers are exempted from state and federal taxes on salaries paid by these organizations.[2]

Under policies adopted by the Board of Regents of the University of Maryland effective for any term of the University beginning on or after January 1, 1974, (hereinafter referred to as the "In-State Policy"), students are divided into two classes, i. e., "in-state" or resident on the one hand and "out-of-state" or non-resident on the other, for purposes of determining admission, tuition rates, and charge differentials. Under this policy "out-of-state" undergraduate students are required to pay $1,260 more per year for tuition than "resident" students, as well as $100 more per year for a room. "Out-of-state" graduate students are charged $30 more per credit hour than "in-state" students.

The relevant sections of the "In-State Policy" are as follows:

"General Policy

"1. It is the policy of the University of Maryland to grant in-state status for admission, tuition and charge-differential purposes to United States citizens, and to *immigrant aliens lawfully admitted for permanent residence in accordance with the laws of the United States,* in the following cases:

"a. Where a student is financially dependent upon a parent, parents, or spouse domiciled in Maryland for at least six consecutive months prior to the last day available for registration for the forthcoming semester.

"b. Where a student is financially independent for at least the preceding twelve months, and provided the student has maintained his domicile in Maryland for at least six consecutive months immediately prior to the last day available for registration for the forthcoming semester. (Emphasis added).

\*　　\*　　\*　　\*　　\*　　\*

"2. It is the policy of the University of Maryland to attribute out-of-state status for admission, tuition, and charge differential purposes in all other cases.

\*　　\*　　\*　　\*　　\*　　\*

"Definitions

"1. A student is financially dependent if he receives half or more than half of his support from another person or persons, or appears as a dependent on the federal or state income tax return of any other person. Conversely, a student is financially independent if he declares himself so, if he receives less than half of

---

1. Title 8, U.S.C., § 1101(a)(15)(G)(iv) defines as one class of non-immigrant alien those aliens who are "officers, or employees of such international organizations [those entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act (59 Stat. 669)], and the members of their immediate families."

2. *See* Art. VII, § 9(b) of the Articles of Agreement of the International Bank for Reconstruc-

tion and Development (12/27/45), 60 Stat. 1440, T.I.A.S. No. 1502, as amended Dec. 16, 1965, 16 U.S.T. 1942, T.I.A.S. No. 5929 and Art. XI § 9(b) of the Agreement Establishing the Inter-American Development Bank, (4/8/59), 10 U.S.T. 3029, T.I.A.S. No. 4397. Plaintiff Clare Hogg's father is employed by the former organization usually referred to as the World Bank; the fathers of the other two named plaintiffs are employed by the latter organization.

his support from any other person or persons and if he does not appear as a dependent on the federal or state income tax return of any other person.

\* \* \* \* \* \*

"4. A domicile is a person's permanent place of abode; namely, there must be demonstrated an intention to live permanently or indefinitely in Maryland. For purposes of this policy only one domicile may be maintained at a given time. . . . "

There are eight criteria which under the "In-State-Policy" "the University shall take into consideration, but shall not be limited to . . . " in determining whether Maryland domicile has been established. These criteria, applied to the individual upon whom the determination of domicile depends, are whether the individual:

a. Owns or rents and occupies real property in Maryland as his (her) domicile on a year-round basis.

b. Maintains a substantially uninterrupted presence within Maryland for six consecutive months, including those months when the University is not in regular session.

c. Maintains within the State of Maryland all or substantially all personal possessions.

d. *Pays Maryland income tax on all earned income* including taxable income earned outside the State.

e. Registers all owned motor vehicles in Maryland.

f. Possesses a valid Maryland driver's license, if licensed.

g. Registers to vote in Maryland, if registered.

h. Gives a Maryland home address on federal and state income tax forms.

(Attachment to Defendant's Answer to Plaintiffs' Request for Admissions of Fact, with emphasis added).

The University determined that the three named plaintiffs were not entitled to "instate" status. The determination was predicated upon a conclusion that the parent on whom each was financially dependent could not be domiciled in Maryland because each was in the country on a G–4 visa. Without success, all three plaintiffs availed themselves of the three-step appellate process provided by the University to students dissatisfied with their residence classification.[3]

The pertinent facts with respect to each of the individual plaintiffs are alleged as follows:

"Plaintiff Moreno's father, Mr. Manuel A. Moreno, is a citizen of Paraguay and is the holder of a G–4 visa; he has been employed by the Inter-American Development Bank for approximately fourteen years. Manuel Moreno has owned a home in Maryland for the past twelve years. Plaintiff Moreno's mother, Mrs. Gladys M. Moreno, is a citizen of Paraguay and is the holder of a G–4 visa. Manuel and Gladys Moreno own no property in Paraguay, having sold the house which they formerly owned there in 1960. Manuel and Gladys Moreno have paid all Maryland State and Montgomery County property taxes on their home as well as all state and local retail, motor vehicle, fuel, excise and other taxes applicable to them as required by law. Manuel and Gladys Moreno each hold a Maryland driver's license; their automobiles are registered in Maryland. Manual and Gladys Moreno have not resided anywhere other than in Maryland for the past fourteen years; they have no present intention to reside anywhere other than in the State of Maryland."

---

**3.** The "In-State Policy" provides that:

"A student who disagrees with his classification may request a personal interview with a classification officer or his designee at which time the student will have an opportunity to present any and all evidence he may have bearing on his classification and to answer any questions which have been raised about his status. A student may further file a written appeal from the campus classification officer or his designee to the Intercampus Review Committee (IRC). If the decision of the IRC is adverse to him, a student may further file a written appeal to the Office of the President of the University. The decision of the President of the University or his designee shall be final."

(Paper No. 1, Verified Complaint, ¶ 16).

"Plaintiff Moreno has lived with his parents since birth. He has lived in the United States since the age of four, has attended primary and secondary schools in the United States without interruption, and graduated from high school in Maryland. Plaintiff Moreno is a citizen of Paraguay; he now holds a G–4 visa. He holds a Maryland driver's license. He has filed United States and Maryland income tax returns for 1973 and 1974. Plaintiff Moreno has not resided anywhere other than in Maryland for the past fourteen years; he has no present intention to reside anywhere other than in the State of Maryland."

(*Id.*, ¶ 18).

"Plaintiff Otero's father, Mr. Rene Otero, is a citizen of Bolivia and is the holder of a G–4 visa; he has been employed by the Inter-American Development Bank for approximately fourteen years. Plaintiff Otero's mother, Mrs. Teresa Bailey Otero, is a citizen of the United States; she is registered to vote in Maryland. Rene and Teresa Otero resided in the District of Columbia from the time of their arrival in the United States in 1960 until 1965, when they moved to Maryland. Rene and Teresa Otero have owned a home in Maryland since 1965 and have resided therein for ten years; they have paid all Maryland State and Montgomery County property taxes thereon as well as all state and local retail, motor vehicle, fuel, excise, and other taxes applicable to them as required by law. Rene and Teresa Otero each hold a Maryland driver's license; Rene Otero's automobile is registered in Maryland. Rene and Teresa Otero own no property in Bolivia. Rene and Teresa Otero have not resided anywhere other than in Maryland for the past ten years; they have no present intention to reside anywhere other than in the State of Maryland."

(*Id.*, ¶ 21).

"Plaintiff Otero has lived with his parents since birth. He has lived in the United States since the age of five and has attended primary schools, secondary schools, and college in the United States without interruption. Plaintiff Otero is a citizen of Bolivia; he now holds a G–4 visa; he has made application to adjust his status to that of immigrant. Plaintiff Otero holds a Maryland driver's license. Plaintiff Otero has filed both United States and Maryland income tax returns in 1972, 1973, and 1974, and he has paid income tax to both Maryland and the United States in each of those three years. Plaintiff Otero has not resided anywhere other than in Maryland for the past ten years; he has no present intention to reside anywhere other than in the State of Maryland."

(*Id.*, ¶ 23).

"Plaintiff [Clare B.] Hogg's father, Mr. Vincent Hogg, is a citizen of the United Kingdom and is the holder of a G–4 visa; he has been employed by the International Bank for Reconstruction and Development for thirteen years. Plaintiff Hogg's mother, Mrs. Barbara Hogg, and the Hoggs' daughter Susan are citizens of the United Kingdom. Susan Hogg married a United States citizen in 1973 and adjusted her status to that of permanent resident alien. Vincent and Barbara Hogg resided in the District of Columbia from the time of their arrival in the United States in 1962 until 1970, when they moved to Maryland. They have resided in Maryland for five years except as described below. Vincent and Barbara Hogg own their own home in Maryland as well as a house in which they formerly resided in the District; the house in the District is rented. Vincent and Barbara Hogg own no real property in the United Kingdom with the exception of a small condominium apartment which is currently listed for sale with a real estate agent and which it is their present intention to sell as soon as a sale can be consummated. Substantially all of their personal property and investments are here in the United States with the exception of a bank account in a sum equivalent to approximately five hundred dollars maintained by Vincent Hogg in the United

Kingdom for the convenience of paying life insurance premiums and professional journal subscriptions; he does not make payments to the United Kingdom's State Pension Fund. Vincent Hogg's will was written in the United States and represents that he resides in Maryland. Vincent Hogg's automobiles are registered in Maryland. Vincent and Barbara Hogg each hold a Maryland driver's license. They belong to the local civic association in the area in which they reside. Vincent and Barbara Hogg have filed joint United States income tax returns every year since 1963. In 1974 they paid income taxes to both the United States and to the State of Maryland on all income other than Mr. Hogg's salary from the International Bank for Reconstruction and Development, as well as all state and local retail, motor vehicle, fuel, excise, and other taxes applicable to them as required by law. Vincent and Barbara Hogg have not resided anywhere other than in Maryland for the past five years, with the exception of a period abroad of approximately nine months as part of Vincent Hogg's employment; they have no intention to reside anywhere other than in the State of Maryland."

(*Id.,* ¶ 26).

"Plaintiff Hogg has resided with her parents since birth. She has lived in the United States since the age of seven and has attended primary schools, secondary schools, and college in the United States without interruption, with the exception of the approximately nine-month period described in paragraph 26 above. Plaintiff Hogg is a citizen of the United Kingdom; she now holds a G–4 visa; she holds a Maryland driver's license. Plaintiff Hogg has filed both United States and Maryland income tax returns in 1973 and 1974. Plaintiff Hogg has not resided

anywhere other than in Maryland for the past five years, with the exception of the approximately nine-month period described in [the above paragraph]; she has no present intention to reside anywhere other than in the State of Maryland."

(*Id.,* ¶ 28).

Plaintiffs claim the actions of defendants in denying them "in-state" status are in violation of the Due Process, Equal Protection and Supremacy Clauses of the Constitution. They seek to enjoin the defendants from failing to reclassify them as students having "in-state" status and to enjoin the defendants from denying to any student "in-state" status either partially or wholly on the basis that such student or any parent or person on whom such student is financially dependent either holds a G–4 visa or pays no Maryland State income tax pursuant to an international agreement to which the United States is a party on wages paid by an international organization.

Defendants have moved for summary judgment on various jurisdictional and procedural grounds, as well as on the merits of the case.

### I. Jurisdiction

Defendants' initial argument is that this court lacks subject matter jurisdiction under 28 U.S.C. § 1343(3) or (4)[4] because plaintiffs' claim is founded upon the Maryland law of domicile and presents no federal question:

"Plaintiffs' cause of action and the core of their grievance does not present a deprivation by the Defendants of a federal statutory or constitutional right, privilege or immunity, but rather, rests upon an interpretation of the Maryland definition of domicile." (Memorandum in Support of Defendants' Motion For Summary Judgment, at p. 10).

---

4. Title 28, U.S.C., § 1343 provides that the district courts have jurisdiction of any civil action authorized by law to be commenced by any person:

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage,·of any right, privilege or immunity secured by the Constitution

of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

Plaintiffs filed this suit pursuant to, *inter alia,* 42 U.S.C. § 1983 which authorizes a "suit in equity" against a "person" to redress "the deprivation" under color of any State regulation "of any rights, privileges, or immunities secured by the Constitution" to any "person within the jurisdiction" of the United States. This section creates a federal cause of action but it does not by itself confer jurisdiction on federal district courts to adjudicate claims brought pursuant to it. The jurisdictional counterpart of 42 U.S.C. § 1983 is 28 U.S.C. § 1343. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Jurisdiction under § 1343(3) exists at least for deprivations by state officials of rights "secured by the Constitution of the United States." [5] Jurisdiction exists in this court under § 1343(3) if a constitutional claim of sufficient substance has been raised by the § 1983 cause of action. *Hagans v. Lavine, supra.*

Plaintiffs' § 1983 claim is premised on the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Contrary to defendants' assertions, it is not the Maryland law of domicile which gives rise to this suit, but rather the "In-State Policy" of the University of Maryland which has been interpreted by the defendants as automatically classifying holders of G–4 visas as non-residents for purposes of tuition, on the assumption that no one in the United States on a G–4 visa can ever have the requisite intent to establish a Maryland domicile. The due process claim, premised on an argument that the University of Maryland's policy establishes an irrebutable presumption with respect to residence and domicile for tuition purposes similar to that struck down in *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), and the equal protection claim, based on an alleged violation of both the strict scrutiny and the reasonable basis-rational relationship tests, are at the heart of this case. These are matters of federal law.

Moreover, these claims are not so insubstantial as to warrant dismissal for lack of subject matter jurisdiction. Such dismissal could be granted only as to claims "absolutely devoid of merit," *Newburyport Water Co. v. Newburyport,* 193 U.S. 561, 579, 24 S.Ct. 553, 48 L.Ed. 795 (1904); "wholly insubstantial," *Bailey v. Patterson,* 369 U.S. 31, 33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); "obviously frivolous," *Hannis Distilling Co. v. Baltimore,* 216 U.S. 285, 288, 30 S.Ct. 326, 54 L.Ed. 482 (1910); or "no longer open to discussion," *McGilvra v. Ross,* 215 U.S. 70, 80, 30 S.Ct. 27, 54 L.Ed. 95 (1909). *See also Hagans v. Lavine, supra; Baker v. Carr,* 369 U.S. 186, 198–204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The claims in this case are clearly not insubstantial. *See Vlandis v. Kline, supra; Hooban v. Boling,* 503 F.2d 648 (6th Cir. 1974); *Kelm v. Carlson,* 473 F.2d 1267 (6th Cir. 1973); *Jagnandan v. Giles,* 379 F.Supp. 1178 (N.D.Miss.1974); *Sturgis v. State of Washington,* 368 F.Supp. 38 (W.D.Wash.), aff'd mem. 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464 (1973); *Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn.1970), aff'd mem. 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971).

## II. Are the Defendants "Persons" within 42 U.S.C. § 1983?

Defendants argue that this suit cannot be maintained against either the University of Maryland or Dr. Elkins, its President, since neither are "persons" within the meaning of 42 U.S.C. § 1983.

In *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the Supreme Court held that municipalities were not "persons" within the meaning of 42 U.S.C. § 1983, at least in damage suits. *Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), makes clear that that ruling also applies where the only relief sought is injunctive or declaratory. *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct.

---

**5.** Whether the jurisdictional scope of § 1343(3) is fully coextensive with the substantive provisions of § 1983, so that § 1343(3) would provide jurisdiction for any suit premised on the deprivation under color of state law of a right se-

cured by any Act of Congress is a question not yet decided by the Supreme Court, *Hagans v. Lavine, supra,* at 534 note 5, 94 S.Ct. 1372, but the Fourth Circuit has so held. *Blue v. Craig,* 505 F.2d 830 (4th Cir. 1974).

1785, 36 L.Ed.2d 596 (1973), established that counties were not § 1983 persons. In *Huntley v. North Carolina State Board of Education,* 493 F.2d 1016, 1017 n.2 (4th Cir. 1974), the Fourth Circuit decided that municipal agencies are not "persons" for § 1983 purposes. A state is also not a proper defendant in a § 1983 action. *Meyer v. State of New Jersey,* 460 F.2d 1252 (3rd Cir. 1972); *Whitner v. Davis,* 410 F.2d 24 (9th Cir. 1969); *Hinish v. State of Maryland,* 393 F.Supp. 53 (D.Md.1975). This doctrine applies equally to state agencies. *Bennett v. People of State of California,* 406 F.2d 36 (9th Cir.), *cert. den.,* 394 U.S. 966, 89 S.Ct. 1320, 22 L.Ed.2d 568; *Cheramie v. Tucker,* 493 F.2d 586 (5th Cir.), *cert. den.,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 107 (1974); *Edwards v. Philadelphia Electric Co.,* 371 F.Supp. 1313 (D.C.Pa.1974), *aff'd* 510 F.2d 969 (3rd Cir. 1975).

If the University of Maryland is a state agency, it is not a "person" within § 1983 and no cause of action can be brought against it under that section. Courts considering whether a particular college or university is or is not a state agency have considered the laws of the state as they define the relationship between the state and the school; whether the school is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of the school's autonomy over its operations; the ownership of the school's property; whether its property is immune from state taxation; whether the sovereign has immunized itself from responsibility for the school's operations; whether a judgment for damages against the school would be payable out of the state treasury; and the source of the school's financing. It has also been stated that generally the same inquiry is made and criteria considered in determining whether a state university is a § 1983 "person" as is made in deciding whether a damage suit against the state university would be barred by the Eleventh Amendment. *See Gordenstein v. University of Delaware,* 381 F.Supp. 718 (D.Del.1974); *Samuel v. University of Pittsburgh,* 375 F.Supp. 1119 (W.D.Pa.1974), *app. dismissed* 506 F.2d 355 (3d Cir. 1974); *Langsner v. Morgan State College,* Civil No. HM–74–1359 (D.Md. Jan. 9, 1976).

In *Langsner* Judge Herbert F. Murray held that Morgan State University was a state agency and not a "person" within the meaning of § 1983. In the present case an uncontradicted affidavit [6] of Dr. Wilson H. Elkins, President of the University of Maryland, has been filed which establishes that virtually all of the factors considered determinative in *Langsner* apply also to the University of Maryland. These factors set forth in the margin [7] fall within the scope

---

**6.** Under Rule 56, F.R.Civ.P., the uncontradicted facts in this affidavit may be taken as true.

**7.** Dr. Wilson's affidavit states:

"(a) All real property of the University belongs to the State of Maryland, and substantially all such property is titled in the name of the State of Maryland to the Use and Benefit of the University of Maryland or to the Use and Benefit of the Board of Regents of the University of Maryland;

"(b) The sale and/or lease of real property of the University is reviewed by the Department of General Services, State of Maryland, and approved by the Board of Public Works (including the Governor of the State of Maryland), State of Maryland. The acquisition and/or lease of real property by the University of Maryland is similarly reviewed and approved;

"(c) All, or substantially all, of the contracts and leases to which the University of Maryland is a party are first reviewed by the Office of the Attorney General, State of Maryland;

"(d) Payroll checks of employees of the University are drawn on the treasury of the State of Maryland and bear the facsimile signatures of the Treasurer and Comptroller of the State of Maryland;

"(e) The annual Budget of the University is presented to and must be approved by the General Assembly of the State of Maryland, and is subject to review and amendment by the State Department of Budget and Fiscal Planning;

"(f) All University funds are funds of the State of Maryland. All funds available to the University are obtained substantially through appropriations of the Maryland General Assembly, including student fees, and government and private grants, which are specifically appropriated by the General Assembly for use by the University. All, or substantial-

of the factors discussed in *Gordenstein, supra,* and *Samuel, supra,* as well. We are persuaded that the University of Maryland, like Morgan State College, is not a § 1983 "person" and cannot be sued under that section.

With respect to the other defendant, Dr. Elkins, however, it is equally clear that when he is sued in his official capacity under 42 U.S.C. § 1983 in a suit seeking injunctive and declaratory relief only, he is a "person" for purposes of that section and amenable to suit thereunder. *Burt v. Board of Trustees of Edgefield Co. School Dist.,* 521 F.2d 1201 (4th Cir. 1975); *Harper v. Kloster,* 486 F.2d 1134 (4th Cir. 1973); *Gay Students Organization of the Univ. of New Hampshire v. Bonner,* 509 F.2d 652 (1st Cir. 1974); *Rochester v. White,* 503 F.2d 263 (3d Cir. 1974); *Langsner v. Morgan State College, supra.*

### III. Case or Controversy

■ Defendants argue that this court lacks jurisdiction because no Art. III § 2[8] case or controversy exists between the plaintiffs and the defendants because the plaintiffs, dependent as they are on their parents, presumably do not pay their own tuition and thus stand to lose or gain nothing by the outcome of this lawsuit. Aside from the lack of evidence in the record to support the underlying assumption on the part of the defendants it is clear that the plaintiffs in this case are presenting a constitutional question "in the context of a specific live grievance." *Golden v. Zwickler,* 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969). It is the plaintiffs themselves who attend the University of Maryland and who are allegedly being unconstitutionally overcharged by that institution.

The plaintiffs in this case have a personal stake in the outcome and have an interest adverse to the defendants since the tuition rates charged them as non-residents must be paid in order for them to attend the University of Maryland. Plaintiffs' complaint alleges that they themselves are being subjected to higher tuition and other costs. Moreover, under Maryland law, *Annotated Code of Maryland,* Art. 1 § 24, plaintiffs who are all over 18, are adults. The law places no responsibility on their parents to pay their tuition. If these rates

ly all, bills paid by the University are paid through checks drawn on the Treasury of the State of Maryland;

"(g) The purchase of goods and equipment by the University is exempt from Maryland Sales Tax. The University is entitled to avail itself of the purchasing facilities of the Maryland Department of Budget and Procurement;

"(h) The University's financial records are audited by the Maryland General Assembly, Division of Legislative Auditors. The University must also provide to the Board of Public Works or any member of the General Assembly any requested information about any phase of its operation, and must make an annual report thereon to the latter;

"(i) Decisions by the University with respect to employment grievances, including terminations, of classified employees, are appealable for determination by the Secretary of Personnel, State of Maryland;

"(j) Such comprehensive liability insurance as the University is permitted to carry is authorized and limited under Article 77A, § 15A of the Annotated Code of Maryland. Insurance to University property is provided through participation in State of Maryland Insurance Plans;

"(k) The Board of Regents of the University consists of fifteen members. The Governor of the State of Maryland appoints fourteen with the advice and consent of the State Senate. The remaining members are the Maryland Secretary of Agriculture;

"(*l*) The Governor, the State Treasurer, and the State Comptroller are notified of all meetings of the Board of Regents of the University and have the authority to sit with the Board. The State budget director, and the chairmen of the State Senate Finance committee and the State House Ways and Means committee are invited to sit with the Board when requests for appropriations are prepared.

"(m) The University obtains its legal representation from the Attorney General of the State of Maryland"

In addition to the above, as noted by Judge Murray in *Langsner,* Art. 78A § 16C of the *Annotated Code of Maryland* would appear to indicate that any money judgment, against the University of Maryland "will be paid, if at all, by the State of Maryland." *Langsner,* p. 9.

8. Art. III § 2 of the Constitution of the United States limits the judicial power of federal courts to "Cases" or "Controversies."

cannot be paid, either by the plaintiffs themselves, by their parents, or by both parents and students, the resulting loss of educational opportunity falls squarely on the plaintiffs. They have a sufficient interest to make the lawsuit an Article III case or controversy under the tests laid down by the Supreme Court. *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Goosby v. Osser,* 409 U.S. 512, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973); *see also Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

### IV. Standing

■ Defendants also allege that plaintiffs lack standing to sue because they are financially dependent on their parents who, therefore, presumably pay all of plaintiffs' tuition costs. While the Supreme Court has noted that the concept of justiciability, which expresses the "case or controversy" requirement of Article III, is not synonymous with that of standing, *Schlesinger v. Reservists, etc., To Stop The War,* 418 U.S. 208, 215, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), they do overlap. *See Warth v. Seldin, supra,* 422 U.S. at 498–499, 95 S.Ct. at 2204, where it is stated:

"In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit. As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Baker v. Carr,* 369 U.S. 186, 204 [82 S.Ct. 691, 7 L.Ed.2d 663] (1962). The Art. III judicial power exists only to

redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action. . . .' *Linda R. S. v. Richard D.,* 410 U.S. 614, 617 [93 S.Ct. 1146, 35 L.Ed.2d 536] (1973). See *Association of Data Processing Service, Inc. v. Camp,* 397 U.S. 150, 151–154 [90 S.Ct. 827, 25 L.Ed.2d 184] (1970)." (Footnotes omitted).

The plaintiffs in this case, as discussed above, are asserting their own legal rights and interests and have a sufficient stake in the outcome of this lawsuit to establish standing to bring it. *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Association of Data Processing Organizations Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

### V. The Eleventh Amendment

Defendants argue that the Eleventh Amendment to the Constitution bars this suit.[9]

■ Since the defendant University of Maryland cannot be sued under 42 U.S.C. § 1983, the Eleventh Amendment defense need be considered only with respect to Dr. Elkins. The short answer to this contention is that the Eleventh Amendment does not bar suits seeking only prospective injunctive relief against state officials who, acting in their official capacity under color of state law or regulation, deprive plaintiffs of constitutional rights. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Any ancillary effect which a prospective injunction against Dr. Elkins, if issued in this case, would have on the treasury of the State of Maryland is a "permissible and often an

9. The Eleventh Amendment provides:
   "The Judicial power of the United States shall be construed to extend to any suit in law or in equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State."

inevitable consequence of the principle announced in *Ex Parte Young, supra.*" *Edelman v. Jordan, supra,* 415 U.S. at 668, 94 S.Ct. at 1358.

## VI. Abstention

■ Defendants urge the court to abstain from deciding this case in order that the Maryland courts can decide if a G–4 alien can be domiciled in Maryland.

Abstention is a judicially created doctrine. It has several branches to its family tree. Two of these branches are urged as applicable here to warrant this federal court to stay its hand.

The first is the abstention rationale enunciated in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), holding that a federal court should abstain in order to avoid unnecessary conflict with the regulation by a state of a complicated area of local interest.

The *Burford* case arose out of disputes concerning the application of a regulation of the Texas Railroad Commission establishing minimum spacing between oil wells. In *Burford* the Court stressed that abstention was appropriate because the Texas scheme of regulating oil and gas drilling was an extremely thorny problem involving certain "non-legal complexities." (*Id.* at 323, 63 S.Ct. 1098). The Texas legislature had established a Commission to resolve these technically complicated geologic factual disputes, "as a part of the entire conservation program with implications to the whole economy of the state." (*Id.* at 325, 63 S.Ct. at 1103). Moreover the Texas legislature had also established a system of thorough judicial review by its own state courts which could provide as full relief as could the federal courts. By concentrating all direct review of the Commission's orders in the state district court of one county, the Texas legislature also sought to avoid the confusion of multiple review of the same general issues. Prior interference by federal courts in this regulatory scheme, the *Burford* Court noted, had previously caused such confusion and had created numerous problems for the Texas Governor, the Texas legislature and the Railroad Commission.

The considerations which persuaded the *Burford* Court to order federal abstention are absent from this case. The process by which the University of Maryland determines a student's domicile does not involve a complicated area which the Maryland legislature has singled out for special treatment. The legislature has not seen the need to create a state agency staffed with experts in order to effect a consistent and harmonizing treatment of a particularly thorny matter of local interest. There is no special system of judicial review. There is no history of prior interference by the federal courts in the University of Maryland's procedures, causing confusion and inconsistency. It is not predictable that the normal functioning of the system by which the state determines a student's domicile would give rise to a surfeit of lawsuits seeking to interpose federal courts in matters of purely state interest. Even this suit, although the named plaintiffs do seek this court to declare them Maryland domiciliaries, has as its primary thrust to force the classification process to operate meaningfully with respect to G–4 alien students. The plaintiffs here are not seeking to "short circuit" the University of Maryland's classification scheme, but rather have submitted themselves to it. A decision by this court on the merits of plaintiff's complaints will not conflict with a state regulatory scheme in the manner feared by the Court in *Burford.* Since none of the factors determinative in *Burford* exists here, abstention on the rationale of that case is not warranted.

The second branch of the abstention family tree invoked by the defendants is the so-called *Pullman* doctrine. The decision in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and its progeny have established that abstention is proper where an interpretation or construction of an unclear state statutory or constitutional provision might end the litigation, thereby eliminating the need for a federal court to resolve federal constitutional issues. *Kusper v. Pontikes,*

414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Lake Carriers' Association v. Mac-Mullan*, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1974). The primary reasons for invoking abstention in the *Pullman* context are to avoid unnecessary friction in federal-state relations and to avoid premature federal constitutional adjudication. *Harman v. Forssenius*, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).

The language of the "In-State Policy" of the University of Maryland which is under attack here is not subject to an interpretation in a Maryland court which would avoid plaintiffs' federal constitutional challenge. That regulation on its face establishes that only "U. S. citizens" and "immigrant aliens" can establish in-state status, and then only under certain conditions which are discussed *infra*. By virtue of the words of the "In-State Policy," the University of Maryland, as a result of the fact that the plaintiffs' fathers, whose domiciles are determinative of their respective dependent's residency status, are all non-immigrant G–4 aliens, will automatically attribute to them out-of-state status for admission, tuition and charge differential purposes. No interpretation of the wording of the "In-State Policy" has been offered which changes that stated result. Since the regulation is clear and is not subject to any interpretation which could avoid a federal constitutional issue, the reasons for invoking the *Pullman* abstention doctrine are absent. *Wisconsin v. Constantineau*, 400 U.S. 433, 437–439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); *Zwickler v. Koota*, 389 U.S. 241, 250, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967).

Nevertheless, defendants argue that abstention is appropriate because the Maryland courts have never decided whether or not a G–4 alien could establish a Maryland domicile. This novel abstention argument would require federal courts to abstain whenever an unresolved question of state common law is involved in federal constitutional litigation. Defendants have presented no authority, and the court has found none, which supports the application of the abstention doctrine in these circumstances. The Maryland common law of domicile is clear and provides sufficient background to resolve the domicile question raised by the plaintiffs in the context of their federal constitutional challenge to the University of Maryland's policies. *See Mariniello v. Shell Oil Company*, 511 F.2d 853, 860–861 (3rd Cir. 1973).

Federal district courts are presumed to be knowledgeable in the law of the states in which they sit, *see Runyon v. McCray*, —— U.S. ——, ——, ——, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), and are often called upon to resolve state law domicile questions in diversity of citizenship cases.[10] While this is not a diversity case and there is a constitutional question to be resolved, on balance, it would be unwise to extend the abstention doctrine to a case such as this. No principles of federalism would be advanced since no unclear state statute or constitutional provision subject to state court construction or interpretation is involved. The delay and expense attendant if the court abstained would be great. Abstention has been confined to certain narrowly limited special circumstances, *Kusper v. Pontikes, supra* ; *Lake Carrier's Association v. MacMullan, supra* ; *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), which do not exist here. Therefore, the court declines to abstain in this case. *See also Examining Board of Engineers, Architects and Surveyors v. DeOtero*, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

## VII.   The Merits

### A.   Due Process

Plaintiffs raise a due process claim, relying principally on *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973);

10. Abstention has never been deemed appropriate in diversity cases merely where there are unsettled questions of state law involved. *McNeese v. Board of Education*, 373 U.S. 668, 673, n. 5, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Meredith v. Winter Haven*, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943); *Martin v. State Farm Insurance Co.*, 375 F.2d 720, 722 (4th Cir. 1967).

*Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), *and Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). While plaintiffs do not challenge the University of Maryland's policy of charging non-domiciliaries higher tuition rates, they do allege that the University of Maryland's "In-State Policy" creates an irrebuttable presumption, that non-immigrant aliens holding G–4 visas cannot establish a Maryland domicile, a fact that is not, they argue, universally true.

In *Vlandis*, the Supreme Court declared unconstitutional a Connecticut statute which classified certain married and unmarried students accepted for admission to the University of Connecticut as out-of-state students for tuition purposes based on the applicant's legal address prior to or at the time of his application. Under the statute, if a student were classified "out-of-state" under this system at the time of application for admission, the student could not change his status no matter what the student's actual domiciliary intent was at a later date. The student's status established at the time of his application for admission was deemed to continue during his period of attendance at the university.

In reaching its decision the Court noted:

"It may be that most applicants to Connecticut's university system who apply from outside the State or within a year of living out of State have no real intention of becoming Connecticut residents and will never do so. But it is clear that not all of the applicants from out of State inevitably fall in this category." (412 U.S. at 448, 93 S.Ct. at 2234).

Under these circumstances, the Court rejected the state's attempts at justification and held that:

". . . since Connecticut purports to be concerned with residency in allocating the rates for tuition and fees in its university system, it is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of non-residence, when that presumption is not necessarily true in fact, and when the State has reasonable alternative means of making the crucial determination. Rather, standards of due process require that the State allow such an individual the opportunity to present evidence showing that he is a bona-fide resident entitled to in-state rates." (412 U.S. at 452, 93 S.Ct. at 2236).

In *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court held unconstitutional on due process grounds Illinois' statutory irrebuttable presumption that all unmarried fathers are unqualified to raise their children. The Court said that a state could not conclusively presume that every unmarried father was unfit to raise his children, but must under the due process clause provide an opportunity for a hearing on the issue of a particular unmarried father's fitness where his fitness was challenged.

Similarly, in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), the Court invalidated mandatory leave and return rules for pregnant teachers in Ohio and Virginia on due process grounds, because the rules established conclusive presumptions of facts which were not universally true, namely that all women, who were 4 or 5 months pregnant or who gave birth 3 months or less before they sought to return to work, were physically incapable of performing their duties. The Court held that such determinations had to be made on an individual basis. The maternity leave rules were found to have no rational relationship to the interests of those states in preserving continuity of instruction and in protecting the health of the mother or expectant mother.

In this case, then, several questions relative to plaintiffs' due process claim must be resolved: (1) does the University of Maryland's "In-State Policy" create an irrebuttable presumption concerning the domicile of a G–4 alien? (2) if so, is that presumption appropriate because universally true? (3) if not, can the defendants so justify that pre-

sumption as to save it from unconstitutionality?

The defendants argue that the "In-State Policy" does not rest upon or create an irrebuttable presumption as to the domicile of a G–4 alien, but merely establishes the status of an individual as a G–4 alien as one of the factors to be considered in determining domicile for tuition purposes, albeit the "paramount" factor. Defendants also argue that there is no irrebuttable presumption, because plaintiffs may, as may any other student, obtain review of their domiciliary classification at any time. However, these arguments fall short of the mark. As admitted at oral argument, and as evidenced by the express language of the "In-State Policy," the University of Maryland determines on a case-by-case basis for tuition and fees purposes the domicile of only *"United States citizens* and . . . *immigrant aliens lawfully admitted for permanent residence* in accordance with the laws of the United States." Under the University's policies, a financially independent student in the United States on the basis of a G–4 visa, or a student who is financially dependent on a parent who holds a G–4 visa, as are the named plaintiffs in this case, is automatically "attributed out-of-state status for admission, tuition, and charge differential purposes. . . ."[11] So long as the G–4 visa status of the student or his parent continues, any other evidence of domicile brought before the University could not possibly produce a reclassification of the student in question. The single controlling factor in the case of a G–4 alien is that visa classification. All other facts relating to domicile are irrelevant. The fact that the State will listen to evidence totally immaterial to its predetermined conclusion concerning the domicile of a G–4 alien does not make that conclusion any less irrebuttable. *See United States Department of Agriculture v. Murry,* 413 U.S. 508, 512, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *Stanley v. Illinois, supra.*

However, even if a certain presumption of fact is irrebuttable, the resulting classification system is not *a fortiori* unconstitutional. If the presumed fact is necessarily true, it would be different from the presumptions about students in *Vlandis,* mothers in *LaFleur,* fathers in *Stanley,* household members in *Murry,* and drivers in *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), among others, which the Court has previously invalidated.

The defendants have argued that domicile is the basis on which tuition rates are determined and that all non-resident aliens, including those in the United States on G–4 visas, are precluded by the terms and conditions of their visas from being domiciled in Maryland. If, as the defendants argue, under the law of domicile of Maryland, a G–4 alien cannot establish domicile, then a classification based on domicile which presumes non-domicile for such aliens is not contrary to fact and is universally true. Inquiry therefore must be made into the common law of Maryland relating to domicile and into federal law defining the nature of a G–4 alien's stay in the United States.

### B. Maryland Law of Domicile

In *Shenton v. Abbott,* 178 Md. 526, 15 A.2d 906 (1940), the Court of Appeals of Maryland held that:

"A person's domicil is the place with which he has a settled connection for legal purposes, either because his home is there or because that place is assigned to him by the law. It is well defined as that place where a man has his true, fixed, permanent home, habitation and principal establishment, without any intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning." (*Id.,* at 530, 15 A.2d at 908).

*Shenton v. Abbott* also establishes that a person retains his original domicile if he does not acquire a new one. Two elements must be shown to prove a change of domi-

---

11. The University bases the tuition rates of a financially dependent student on the domicile of his parents. A parent with a G–4 visa could not, under the In-State Policy, establish a Maryland domicile.

cile: (1) actual removal to or physical presence in another habitation and (2) an intent to remain there permanently or at least for an unlimited time. *Id.* at 530, 15 A.2d 906. If a person has established a new domicile, a "floating intent to return to his former domicil at some future time" does not negative the intent to establish the new domicile. *Id.* at 533, 15 A.2d at 909.

It is indisputable in this case that plaintiffs' fathers, because they are G–4 aliens, did not have Maryland as their respective original domiciles but each could only have acquired a Maryland domicile if he had changed his original domicile. The court in *Shenton* also stated:

"No temporary residence, whether for the purposes of business, health, or pleasure, occasions a change of domicil. Even though a person may be absent from his domicil for many years, and may return only at long intervals, nevertheless he retains his domicil if he does not acquire a domicil elsewhere." (*Id.,* at 530, 15 A.2d at 908).

As a general proposition of law, *Shenton* noted that "[T]he determination of the place of domicil depends upon the circumstances of each case." (*Id.,* at 533, 15 A.2d at 909). All of these principles are still controlling Maryland law. *Bainum v. Kalen,* 272 Md. 490, 325 A.2d 392 (1974); *Knapp v. Comptroller,* 269 Md. 697, 309 A.2d 635 (1973); *Liberty Mutual Insurance Co. v. Craddock,* 26 Md.App. 296, 338 A.2d 363 (1975).

In addition to physical presence and intent to remain permanently or indefinitely, the Maryland courts implicitly recognize, as another factor necessary to the establishment of a new domicile, that the person seeking to change his domicile must have the legal capacity to do so. *Liberty Mutual Insurance Co. v. Craddock, supra,* at 303, 338 A.2d 363. *See Restatement (Second) of Conflicts,* § 15 (1971). Thus, in the case of a minor child, ordinarily legally incapable of a domicile separate from that of its parent, the domicile of a minor child in Maryland is with its parents. If the child's parents are divorced, the child's domicile is that of the parent to whom legal custody has been awarded. *Taylor v. Taylor,* 246 Md. 616, 619, 229 A.2d 131 (1966); *Berlin v. Berlin,* 239 Md. 52, 55, 210 A.2d 380 (1964); *Rethorst v. Rethorst,* 214 Md. 1, 133 A.2d 101 (1957). However, a minor child retains the domicile of its father if the child lives with neither parent. *Rethorst v. Rethorst, supra,* at 12, 133 A.2d 101. If there has been no legal fixing of custody, then the minor child's domicile is that of the parent with whom it lives. *Id.; Ross v. Pick,* 199 Md. 341, 349, 86 A.2d 463 (1952). A minor child who falls within these common law principles can never establish an independent domicile, whatever may be that child's intent to do so. Because a minor child is not *sui juris* and can therefore not have legal effect given to its actual intent, physical presence in a certain state, and an intent to remain there indefinitely, do not fix or change the domicile of a minor. During minority, the common law fixes the child's domicile. *Sudler v. Sudler,* 121 Md. 46, 88 A. 26 (1913).

There is nothing in Maryland law, possibly aside from the principle that a person intending a change in domicile must be legally capable of doing so, to prevent a G–4 visa holder from obtaining a Maryland domicile. Therefore, federal law must be examined to determine whether such law relating to G–4 aliens in any respect renders such aliens legally incapable of changing their domicil.

## C. Federal Law

The Immigration and Nationality Act of 1952, 8 U.S.C. § 1101 *et seq.,* defines 12 classes of nonimmigrant aliens which, including subclasses, describe 17 types of nonimmigrants. Class G aliens are aliens who are in the United States as resident representatives of foreign governments and members of their immediate families and staffs, as well as aliens who are foreign representatives to or employees of international organizations covered by the International Organizations Immunities Act, 22 U.S.C. § 288, and members of their immediate families and personal staffs. Specifically, G–4 aliens are:

"(iv) officers, or employees of such international organizations and the members of their immediate families."

In contrast to those classes of aliens who are defined as aliens "having a residence in a foreign country which [they have] no intention of abandoning," 8 U.S.C. § 1101(a)(15)(B), (F), (H), (J), or as aliens who intend to enter the United States "temporarily" or who are "in transit" § 1101(a)(15)(C), (D), (L), a G–4 alien is simply defined as an employee of an international organization. The statute, therefore, does not define a G–4 alien in terms of an express intent on the part of such alien relative to his domicile.

The visa itself held by a G–4 alien is not determinative of the domicile issue. A visa is essentially a document of entry. *Alves v. Alves,* 262 A.2d 111, 115 (D.C.App.1970); *see* 22 C.F.R. § 41.120. Its period of validity has no relation to the period of time an alien may be authorized by the immigration authorities to stay in the United States. 22 C.F.R. § 41.122(a). The stay of a G–4 alien is governed by regulations of the Immigration and Naturalization Service. 8 U.S.C. § 1184(a). As provided in 8 C.F.R. § 214.-1(a):

"(a) *General.* Every nonimmigrant alien applicant for admission or extension of stay in the United States shall . . . agree that he will abide by all terms and conditions of his admission or extension, and that he will depart at the expiration of the period of his admission or extension or an abandonment of his authorized nonimmigrant status."

The period of admission of a G–4 alien is for so long as the alien continues to be recognized by the Secretary of State as a member of that class of aliens. In terms of the present case, the period of admission of the plaintiffs' fathers is for so long as they

are respectively employed by international organizations governed by the International Organizations Immunities Act, cited *supra.* 8 C.F.R. §§ 214.1(a), 214.2(g).[12]

■ The mere fact that a G–4 alien is subject to being deported if he changes his employment does not make him legally incapable of establishing a Maryland domicile or of intending to remain or remaining here indefinitely. In *Alves v. Alves, supra,* the District of Columbia Court of Appeals held specifically that a G–4 alien was domiciled in the District of Columbia. In that divorce case the appellant wife challenged the finding of the lower court that her husband was a D.C. domiciliary on the ground here argued that "the appellee did not have the legal capacity to form an intention to become a domiciliary of the District of Columbia since he was living here at the grace of Great Britain and the United States." (*Id.,* at 114). The wife also argued that the husband had to adjust his status to permanent resident before he could become domiciled in the District of Columbia.[13] The *Alves* court rejected the last contention holding that under the immigration laws it is legally possible "for an alien to remain in the United States for many years . . . without applying for permanent residence" and that such a contention wrongfully ignores, "the period of time [the alien had] resided in the District of Columbia, his intention in moving into the District of Columbia and other relevant factors." (*Id.,* at 115). As to the first contention the court held:

"The fact that appellee entered the United States on a nonimmigrant visa . . . does not preclude a finding that appellee could become domiciled in the District of Columbia.

\*     \*     \*     \*     \*     \*

. . . At best it might be argued appellee had a floating intent to return to

---

**12.** Under 8 U.S.C. § 1251(a)(9) an alien is subject to deportation who—"(9) was admitted as a nonimmigrant and failed to maintain the nonimmigrant status in which he was admitted or to which it was changed . . ., or to comply with the conditions of any such status."

**13.** The domicile rule in the District of Columbia as quoted by the court in *Alves* is substantially similar to the Maryland rule:

". . . physical presence with an intent to abandon the former domicile and to remain in the District of Columbia for an indefinite period of time." (*Alves, supra,* at 114).

Great Britain conditioned upon an uncertain event—his dismissal from the I.M.F.—which event may never occur. But such a floating intention to return to Great Britain is not sufficient to require a holding that appellee was still domiciled in Great Britain." (footnotes omitted). (*Id.,* at 115–116).

*Accord, Rzeszotarski v. Rzeszotarski,* 296 A.2d 431 (D.C.App.1972); *Gosschalk v. Gosschalk,* 48 N.J.Super. 566, 138 A.2d 774, aff'd, 28 N.J. 73, 145 A.2d 327 (1958). The Court of Appeals of Maryland, as mentioned above, has also held that a floating intent to return to a former domicile at some future date does not negative the intent to establish a new domicile. *Shenton v. Abbott, supra,* at 533, 15 A.2d 906.

The *Restatement (Second) of Conflicts* recognizes in § 17, Comment g, that a refugee may acquire a domicile of choice even if he is present in this country on a temporary visa:

"Even in the latter situation, [refugee present on a temporary visa] it is possible for a refugee to acquire a domicile of choice in his asylum, although the presumably temporary nature of his stay may cast some doubt upon whether he has formed the requisite attitude of mind toward it. . . ." (Citations omitted). (*Id.,* at 69).

The *Restatement* also states with respect to domiciliary intent that:

"[I]f [one] does not intend to move at a definite time, it is easier to find that he has this attitude of mind than if he intends to move at a definite time. It is possible, however, for a person to have the proper attitude of mind even though he does intend to move at a definite time; although the more distant that time is, the easier it is to find the requirement satisfied." (*Id.,* at 71).

The rule expressed in *Alves* and in the *Restatement,* as applied to a G–4 alien, who presently intends to remain in Maryland indefinitely but who may have to return to his native country at the conclusion of his employment, makes it clear that such a G–4 alien is not legally incapable of establishing a Maryland domicile. Furthermore, as noted *supra,* there is nothing in the statutory definition in 8 U.S.C. § 1101 of a G–4 alien, as opposed to certain other types of nonimmigrant aliens, which indicates that Congress sought to negate a domiciliary intent on the part of a G–4 alien.

In summary, under Maryland law the plaintiffs' fathers must be able to demonstrate physical presence in Maryland, an intent to remain here indefinitely and the legal capability to do so. The federal immigration laws do not render the plaintiffs' fathers legally incapable of demonstrating and being able to carry out a present intention to remain in Maryland indefinitely. Plaintiffs' fathers' G–4 status, in fact, gives them that precise status, residents of Maryland for an indefinite period of time. This legal capacity coupled with physical presence and sufficient evidence of the requisite intent is all that the law of Maryland requires to establish domicile.

Defendants place principal reliance on Revenue Ruling 74–364 and *Seren v. Douglas,* 30 Colo.App. 110, 489 P.2d 601 (1971).

The Revenue Ruling squarely holds that a G–4 alien is under a legal disability which renders him incapable of forming the intention necessary to establish a domicile in the United States. That holding is based on the fact that a G–4 alien is required to depart at the expiration of the period of his admission. However, as demonstrated above, under federal law a G–4 alien is capable of remaining in Maryland indefinitely and, therefore, has the legal capacity to have the necessary intent to establish a Maryland domicile while physically present in Maryland. As an explication of the *law of domicile*, this court believes the Revenue Ruling is in error.

Revenue Ruling 74–364 relies as do the defendants, on *Seren v. Douglas, supra.* In that case, Seren, a student, entered the United States in 1967 on a student visa which expired in April, 1968. In July of 1968, after Seren had married a University of Colorado coed, a petition for an immigrant visa was granted which entitled him

to apply for status as a permanent resident alien. On January 20, 1970, the United States Immigration and Naturalization Service granted Seren the status of "lawful permanent resident." The University of Colorado contended that Seren, who had been a non-student resident of Colorado between April, 1968, and January, 1970, was under a legal disability prior to January 20, 1970, to formulate the requisite intent to become domiciled in Colorado. The University based its contention on the fact that Seren had entered the United States on a student visa and was a nonimmigrant alien classified under 8 U.S.C. § 1101(a)(15)(F)(i) as an alien with "a residence in a foreign country which he has no intention of abandoning . . . who seeks to enter the United States temporarily and solely for the purpose of pursuing . . . a course of study . . . ." With respect to this argument, the court held:

> "We agree that the federal statutes in question did create a legal disability which would render Seren incapable of forming the intent required by state statute *so long as he, in compliance with federal law, was here on a legal basis which bound him to not abandon his homeland.* However, that disability could, as a matter of fact and law, have dissolved upon the expiration of his student visa. At such time he could abandon his legal intent to return to his homeland and seek status as a permanent resident of the United States." (Emphasis added).

A G–4 alien is not bound by federal law "to not abandon his homeland" and could at any time "abandon his legal intent to return to his homeland and seek status as a permanent resident of the United States." Therefore, the very language of the *Seren* court warrants a holding that a G–4 alien is not under a legal disability to establish a Maryland domicile. The *Seren* court also held that the dissolution of Seren's legal disability was not contingent on his being granted lawful permanent resident status on January 20, 1970, but that the disability dissolved prior to that date.

*In Re Gaffney's Estate,* 141 Misc. 453, 252 N.Y.S. 649 (1931), also relied on by the defendants, is distinguishable on at least two grounds. That case dealt with whether Patrick Cassidy, who had "arrived in this country only recently" (*id.,* at 652) as a temporary visitor for 3 months only, could qualify under New York law to be appointed as administrator of his brother's estate. New York law rendered incompetent one who was an "alien not an inhabitant of this state." In finding that Cassidy was not competent, the court relied on the fact that Cassidy was present only for 3 months on a visitor's visa and would have to leave the country at the end of that time. As distinguished from Cassidy's situation, the holder of a G–4 visa is not under similar constraints. In noting that, "[A]lienage alone does not disqualify an administrator, but there must be adequate proof of his being an inhabitant" (citation omitted) (*id.,* at 653), the *Gaffney's Estate* court highlighted the second ground upon which that case is distinguishable from this one. Far from deciding that a nonimmigrant alien could never establish a domicile in the United States, the court there decided only that Mr. Cassidy did not establish by competent evidence that he was an "inhabitant" of New York.

The presumption utilized by the University of Maryland in enforcing its "In-State Policy" is that no class of nonimmigrant aliens can establish a Maryland domicile. As such, it is an irrebuttable presumption which is not universally true since G–4 aliens are not legally incapable of establishing Maryland domicile. That the University has "reasonable alternative means of making the crucial determination" of a nonimmigrant alien's domicile, *Vlandis v. Kline, supra,* 412 U.S. at 452, 93 S.Ct. at 2236, is demonstrated by the fact that it makes just such a determination on a case-by-case basis with regard to other students seeking to pay domiciliary tuition rates under its "In-State Policy." The irrebuttable presumption relating to nonimmigrant aliens encompassed by the University's "In-State Policy"

therefore is an invalid measure of domicile.[14]

If the University were to seek to justify its treatment of nonimmigrant aliens on the theory of cost equalization, this argument must fail because basing a conclusive presumption of non-domicile on nonimmigrant status would be as stated in *Vlandis* "wholly unrelated to that objective." (*Id.*, at 441, 93 S.Ct. 2230). Nonimmigrant aliens, even those such as plaintiffs' fathers whose salaries are exempt from state income tax, who have resided in Maryland for 10 or 15 years, as have plaintiffs' fathers, might well have contributed far more financial support to the University of Maryland through payment of real property, sales and other taxes than would have a student, financially independent for at least 12 months, who maintained a domicile in Maryland for 6 months prior to his class registration. Yet such a student, who conceivably could have contributed almost nothing to the Maryland tax base, is allowed to prove Maryland domicile under the "In-State Policy." Nor can the University's policy be justified on the ground of administrative certainty or administrative convenience. *Vlandis v. Kline, supra,* at 441, 93 S.Ct. 2230; *Stanley v. Illinois, supra,* 405 U.S. 656, 92 S.Ct. 1208. *Cf. City of Charlotte v. Local 660, etc.,* 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976).

Since the "In-State Policy" of the University of Maryland, as applied to G–4 aliens, creates a constitutionally impermissible irrebuttable presumption, it is not necessary to reach the issues raised by plaintiffs' equal protection and supremacy clause claims.

### D. Relief

Declaratory relief and an injunction prohibiting the University of Maryland from denying to the plaintiffs in-state status solely because they or their parents are holders of a visa under 8 U.S.C. § 1101(a)(15)(G)(iv) must be granted in this motion for summary judgment.[15] However, in addition plaintiffs also request this court (1) to enjoin the defendants from failing to classify them as in-state students, (2) to certify this suit as a class action, (3) to frame appropriate relief for the class so certified, and (4) to award plaintiffs costs and attorneys' fees.

In order for plaintiffs to prevail on this motion for summary judgment in their request that they be classified as in-state students, the court must find that there is no dispute concerning the facts material to a determination that each of the fathers of the plaintiffs, on whom each plaintiff is dependent, is domiciled in Maryland.

14. The fact that Congress, empowered by the Constitution and statute to distinguish between citizens and aliens, may legitimately draw lines to establish qualification requirements, under which certain aliens will be eligible for federally funded programs and others will not, does not necessarily raise parallel powers in the States. *See Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

15. Neither declaratory nor injunctive relief with respect to plaintiffs' fathers' tax-exempt status is warranted. Because the University of Maryland automatically determined that the plaintiffs' fathers', as G–4 aliens, were not Maryland domiciliaries, the University never meaningfully applied domiciliary criteria, see *supra,* to the plaintiffs. One of these criteria is whether or not the person whose domicile is being determined pays Maryland income tax on all earned income. The record does not establish that the University would universally deny "in-state" status to students solely on this

ground. In fact, the defendants have admitted that a parent holding an immigrant visa could establish Maryland domicile regardless of a Maryland income tax exemption, if that parent could demonstrate the other relevant domiciliary criteria. (Defendants' answers to plaintiffs' requests for admissions, Paper No. 7, ¶ 10). This issue is not ripe for resolution in this case. Since the University of Maryland will be required, henceforth, to review G–4 aliens in the same manner as citizens and immigrant aliens, the court will presume that all of these individuals will be given the same kind of review. The court will also presume that, consistent with the University's admission, it will not preclude any student from establishing that he or she is a domiciliary of Maryland solely because of that student's parent's Maryland tax-exempt status under an international agreement. If the University were to act contrarily, serious constitutional questions would arise.

■ The law in this Circuit governing summary judgment is very strict. In order for summary judgment to be granted there can be no dispute as to any material fact or as to any controlling inference to be drawn from material facts. *American Fidelity and Casualty Co. v. London and Edinburgh Insurance Co.*, 354 F.2d 214, 216 (4th Cir. 1965). The burden is on the plaintiffs to establish that there are no such disputes, and any doubt as to the existence of a disputed material fact or inference drawn therefrom must be resolved against the plaintiffs. *Phoenix Savings and Loan, Inc. v. Aetna Casualty & Surety Co.*, 381 F.2d 245, 249 (4th Cir. 1967).

Plaintiffs, in attempting to establish that the undisputed facts warrant a holding that their fathers are domiciled in Maryland, rely on their Verified Complaint and the exhibits attached thereto and on the affidavits filed as part of their motion for summary judgment.

■ Plaintiffs' reliance on the Verified Complaint filed in this case is misplaced. Since the relevant domicile for tuition purposes under the valid portion of the University's "In-State Policy" is the domicile of plaintiffs' fathers, any verification of facts alleged in the complaint by the plaintiffs themselves is of little evidentiary value on the crucial question of the present intent of each father to remain permanently or indefinitely in Maryland. Counsel for the plaintiffs have not filed any affidavits of plaintiffs' fathers in this case which contain relevant evidence of this intent. The complaint itself is only verified by the plaintiffs with respect to the allegations that pertain to them. (Paper No. 1). In addition, the verifications are only on "information and belief." While it is true that sworn and notarized pleadings may sometimes be considered the equivalent of affidavits in summary judgment proceedings, *Fletcher v. Norfolk Newspapers, Inc.*, 239 F.2d 169 (4th Cir. 1956); *Dabney v. Cunningham*, 317 F.Supp. 57 (E.D.Va.1970), the verified pleadings in those cases contain only facts about which the pleader had personal knowledge and which concerned him

directly. In order for a verified complaint to substitute for an affidavit, it must meet the standards of F.R.Civ.P. 56(e), that is it must be made "on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters therein." *Runnels v. Rosendale*, 499 F.2d 733 (9th Cir. 1974); *Fowler v. Southern Bell Telephone & Telegraph Co.*, 343 F.2d 150 (5th Cir. 1965); *Avery v. Norfolk & Western Railway Co.*, 52 F.R.D. 356 (N.D.Ohio 1971); 6 J. Moore, *Federal Practice*, ¶ 56.11[3], pp. 56–249–251 and ¶ 56.22[1], pp. 56–1303–1311 (1976). [Hereinafter, *Moore*]. The Verified Complaint in this case does not meet this standard and is inadequate to support plaintiffs' motion for summary judgment.

The fact that defendants filed no opposing affidavits setting out contradictory facts and merely relied on denials in their Answer (Paper No. 3, ¶¶ 16, 18, and 21) concerning facts relevant to plaintiffs' fathers' domicile is not significant in this case. Such denials would have been insufficient under F.R.Civ.P. 56(e) if the plaintiffs had met their burden of establishing that the relevant facts were not in dispute and that they were entitled to judgment as a matter of law. However, if a party moving for summary judgment fails to meet his burden, it is not incumbent upon the opposing party to do anything. *Adickes v. Kress & Co.*, 398 U.S. 144, 159–161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); F.R.Civ.P. 56(c); 6 *Moore*, ¶ 56.11[3] p. 56–252, ¶ 56.23, p. 56–1390.

■ Of course, under F.R.Civ.P. 56(c) plaintiffs may rely solely on the pleadings and do not have to file any supporting data if they choose not to do so. A motion made by a claimant on the basis of the complaint and answer is functionally equivalent to a motion for judgment on the pleadings under Rule 12(c). *Schwartz v. Compagnie General Transatlantique*, 405 F.2d 270 (2d Cir. 1968); 6 *Moore*, ¶ 56.02[3], p. 56–29; ¶ 56.09; ¶ 56.11[1.–1]; ¶ 56.11[2], p. 56–210. However, because defendants' Answer has raised an issue of material fact

with respect to the allegations in the Verified Complaint concerning plaintiffs' fathers' domiciles (Paper No. 3, ¶¶ 16, 18, and 21), plaintiffs may not prevail on this ground either. *Id.;* 2A *Moore,* ¶ 12.15. Since there is nothing in the entire record with respect to the fathers of plaintiffs Hogg and Moreno on which plaintiffs can rely in meeting their burden under Rule 56 on this factual question, this court cannot now enjoin the defendant from failing to classify students Hogg and Moreno as in-state students on the basis of the current record.

With respect to the father of plaintiff Otero, the record does contain some material filed as exhibits to the Verified Complaint which is entitled to consideration on this issue. In the process of attempting to convince the University of Maryland that plaintiff Otero was domiciled in Maryland, Rene Otero, plaintiff's father, partially completed under oath the University of Maryland form entitled "Petition for In-State Classification for Admission, Tuition and Charge-Differential Purposes." This form requires that the parent upon whom the student's domicile depends fill out sections II and IV of the form.

In section II Rene Otero has stated that he occupies real property in Maryland as his domicile on a year-round basis; that he has resided in Chevy Chase, Maryland since March 1, 1965; that all or substantially all of his possessions are in the State of Maryland; that Mrs. Otero is registered to vote in Maryland; that he has a Maryland driver's license and that his car is registered in Maryland. Rene Otero has also filed copies, certified by him to be true copies and sworn to before a notary, of his wife's Maryland driver's license, his driver's license, his Maryland automobile registration for 3 automobiles, and his son's W-2 forms and Maryland Income Tax form, all listing Chevy Chase as their address. It is also undisputed from the record that Rene Otero is a G-4 alien employed with Inter-American Development Bank; that Mrs. Otero is an American citizen; that Rene Otero has not made any attempt to adjust his status

from G-4 to resident alien; and that his current employer has a policy which would prevent him from making that adjustment while he is so employed. While all of these facts are material in the determination of Mr. Otero's domicile, the record is still deficient in evidence concerning his domiciliary intent. This crucial factor of intent is one which is particularly difficult to resolve on the basis of a bare written record and summary judgment can seldom be granted in cases where intent is in issue. *Denny v. Seaboard Lacquer, Inc.,* 487 F.2d 485 (4th Cir. 1973); *Conrad v. Delta Air Lines; Inc.,* 494 F.2d 914 (7th Cir. 1974); *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Therefore, even though the court has before it some evidence of Mr. Otero's domicile, summary judgment cannot be entered in favor of plaintiff Juan Pablo Otero.

### E. Class Action

■ Plaintiffs seek to maintain this suit as a class action under F.R.Civ.P. 23(b)(2) which applies to suits in which:

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

It is clear that the University's actions with respect to classifying G-4 aliens or their dependents as out-of-state students have been taken in accordance with official University policy and thus "on grounds generally applicable to the class." This case is then appropriately brought under 23(b)(2), assuming plaintiffs meet the additional burdens imposed upon them to establish that this suit should proceed as a class action.

F.R.Civ.P. 23(a) provides 4 additional prerequisites for the maintenance of a class action. A class action may be maintained under Rule 23 only if:

"(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the

claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The burden is on the plaintiffs to meet these and all of the requirements for the maintenance of a class action. *Carracter v. Morgan,* 491 F.2d 458 (4th Cir. 1973); *Poindexter v. Teubert,* 462 F.2d 1096 (4th Cir. 1972); *McAdory v. Scientific Research Instruments, Inc.,* 355 F.Supp. 468 (D.Md. 1973). In order to determine if plaintiffs have met their burden, the appropriate class which plaintiffs may represent must be determined.

Plaintiffs seek to represent a class consisting of all persons residing in Maryland who now attend or may in the future wish to attend the University of Maryland and who:

> (a) hold or are named within a visa under 8 U.S.C. § 1101(a)(15)–(G)(iv) or are financially dependent upon another person holding or named within such visa; or

> (b) pay no Maryland State income tax on a salary or wages from an international organization under the provisions of an international agreement to which the United States is a party or are financially dependent upon another person who does not pay such tax on such salary or wages for such reasons.

Plaintiffs seek declaratory and injunctive relief on behalf of the members of the class.

The thrust of the class aspects of plaintiffs' suit is to force the University to provide an opportunity for prospective class members to demonstrate Maryland domicile. The court believes that the class which the plaintiffs seek to represent is too broad and must be limited to individuals satisfying criteria (a) above, residing in Maryland, who are current students at the University of Maryland, or who chose not to apply to the University of Maryland because of the challenged policies but would now be interested in attending if given an opportunity to establish "in-state" status, or who are currently students in senior high schools in Maryland. It is these individuals

against whom defendants' policies have already operated or would operate in the near future if they were to continue in effect.

Defendants' proposed limitation of the class to those students, either G–4's or their dependents, who have previously attempted to demonstrate Maryland domicile is too narrow. *Cf. Player v. State of Alabama, Dept. of Pensions and Security,* 400 F.Supp. 249, 253, 259 (M.D.Ala.1975). Under the University's policy such an attempt would have been futile. Individuals who have been or will soon be discouraged from applying to the University of Maryland because of the University's policies regarding G–4 aliens are appropriate class members. *Cypress v. Newport News General and Nonsectarian Hospital Ass'n,* 375 F.2d 648, 653 (4th Cir. 1967); *Long v. Sapp,* 502 F.2d 34, 43 (5th Cir. 1974); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 254 (3rd Cir. 1975), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1976); *cf. Green v. Cauthen,* 379 F.Supp. 361, 371–2 (D.S.C.1974).

The court finds no merit in defendants' preliminary argument that plaintiffs have abandoned the class action aspects of this suit. Plaintiffs' motion for class certification, filed on November 18, 1975, in a suit instituted on May 27, 1975, and before any hearings on the merits, was timely and allows the court to determine if class certification is appropriate within the "practicable" time limits of Rule 23(c)(1).

Since elsewhere in this opinion the court has already determined that plaintiffs do have standing to sue on their own behalf, defendants' objection to a class action suit on that ground must also fail. Defendants have not disputed, nor could they, that there are "questions of law . . . common to the class" as required by Rule 23(a)(2) since injunctive and declaratory relief for all the class members depends on the resolution of the same question of law, the legality of the University of Maryland's policy prohibiting G-4 aliens an opportunity to show that they are domiciled in Maryland. For the same reason, plaintiffs have also met the "typical claims" requirement

of Rule 23(a)(3). Defendants have not attempted to argue to the contrary on this question. Finally, since plaintiffs' able and diligent counsel have adequately and fairly represented the interest of the class heretofore described and since the plaintiffs do not have interests antagonistic to those of the class, Rule 23(a)(4) has been satisfied. *Oxendine v. Williams*, 509 F.2d 1405 (4th Cir. 1975); *Wetzel v. Liberty Mutual Insurance Co, supra; American Finance System, Inc. v. Harlow*, 65 F.R.D. 94 (D.Md.1974).

Defendants' major argument in opposition to class certification is that plaintiffs have not satisfied the "numerosity" requirement of Rule 23(a)(1) which requires the plaintiffs to demonstrate that joinder of all members is impracticable. This rule requires plaintiffs to make a positive showing that joinder is impracticable. *Tolbert v. Western Electric Co.*, 56 F.R.D. 108, 113 (N.D.Ga.1972). Neither bare allegations of numerosity nor speculation as to the number of parties will suffice. *Kinsey v. Legg, Mason & Co., Inc.*, 60 F.R.D. 91 (D.D.C. 1973); *Tuma v. American Can Co.*, 367 F.Supp. 1178 (D.N.J.1973). However, a plaintiff need not establish a class size with precision; it is sufficient if he presents some information from which the number of class members can be approximated. *Sims v. Parke Davis & Co.*, 334 F.Supp. 774 (D.Mich.1971), *cert. denied* 405 U.S. 978, 92 S.Ct. 1196, 31 L.Ed.2d 254 (1972). In this regard, the Advisory Committee on the Federal Rules of Civil Procedure noted in discussing Rule 23(b)(2):

". . . Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

"Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose numbers are incapable of specific enumeration. . ." (citations omitted). 39 F.R.D. 73, 102.

Plaintiffs have submitted the affidavits of Arnold Weiss and John D. North (attachments to Paper No. 16) in support of their motion for class certification. Mr. Weiss's affidavit indicates that as of May, 1975, there were "157 children between the ages of 16–25 holding G–4 visas and dependent on and living in homes of Bank employees living in Maryland." Mr. North indicates that, based on a random sample at the end of 1975 of 15% of the World Bank's employees, just under 1,000 employees holding G–4 visas reside in Maryland. Mr. North, based on hard 1973 data, and ratios based on the 1975 sample, states that "there are today (Jan. 8, 1976), very approximately, nearly 500 dependent children, about one-third of them of the age of 15 or over, living in the homes of World Bank employees who hold G–4 visas and who reside in the State of Maryland." These data are as specific as are required, given the fact that this is a Rule 23(b)(2) class action suit and that plaintiffs have demonstrated the unconstitutionality of the University of Maryland's policies in question here. The court finds that plaintiffs have met the burden imposed on them by Rule 23(a)(1) to demonstrate that the class described *supra* is so numerous that joinder of all members would be impracticable. Therefore the court will grant plaintiffs' motion for class certification for a class to be defined as follows:

All persons now residing in Maryland who are current students at the University of Maryland, or who chose not to apply to the University of Maryland because of the challenged policies but would now be interested in attending if given an opportunity to establish in-state status, or who are currently students in senior high schools in Maryland, and who

(a) hold or are named within a visa under 8 U.S.C. § 1101(a)(15)(G)(iv) or are financially dependent upon a person holding or named within such a visa.

Declaratory relief is granted to the members of this class and defendants are enjoined from denying to the members of this class in-state status solely because they or

their parents are holders of a visa under 8 U.S.C. § 1101(a)(15)(G)(iv).

Since the issue of the domicile of the fathers of the three named plaintiffs remains to be resolved, the court will not decide at this time the question of court costs and attorneys' fees.

Therefore, it is this 13th day of July, 1976, ORDERED:

(1) That defendant University of Maryland's motion for summary judgment is GRANTED and the University of Maryland is dismissed as a defendant in this case;

(2) That defendant Dr. Wilson H. Elkins' motion for summary judgment is DENIED;

(3) That plaintiffs' motion for class action determination is GRANTED and that the class is certified as described in the foregoing opinion;

(4) That plaintiffs' motion for summary judgment is partially GRANTED and partially DENIED;

(5) That the "In-State Policy" of the University of Maryland which denies to G–4 aliens by the use of an irrebuttable presumption of non-domicile the opportunity to establish "in-state" status is unconstitutional as it is in violation of the Due Process Clause of the Fourteenth Amendment; and

(6) That defendant Dr. Wilson H. Elkins is hereby enjoined from enforcing the University of Maryland's "In-State Policy" with respect to the named plaintiffs and the members of their class by denying them the opportunity to demonstrate that they or any of them are entitled to "in-state" status for purposes of tuition and charge differential determinations.